[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-14540

_____

D.C. Docket No. 1:12-cr-20901-WPD-2


UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

CRAIG STANLEY TOLL,

Defendant–Appellant.


_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(November 3, 2015)

Before WILLIAM PRYOR, JULIE CARNES, and SILER,[*] Circuit Judges.

WILLIAM PRYOR, Circuit Judge:

---

[*] Honorable Eugene E. Siler Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

This appeal requires us to decide whether the district court abused its discretion by allowing a lay witness to testify about the financial statements of the company that employed him as its controller and whether sufficient evidence supports Craig Toll's ten convictions for participating, as chief financial officer of the same company, in schemes to defraud investors and the United States. The government presented evidence that Toll maintained two sets of financial statements and used one set to mislead investors and the United States. And the controller testified that, when the two sets of statements were prepared, he believed only the other set complied with Generally Accepted Accounting Principles. A jury convicted Toll of two counts of conspiracy to commit wire fraud, one count of conspiracy to engage in financial transactions with criminally derived property, three counts of wire fraud, one count of major fraud against the United States, and three counts of making false statements to a federal agency. The district court did not abuse its discretion by admitting the controller's testimony, and the government presented sufficient evidence to convict Toll. We affirm.

## I. BACKGROUND

Toll served as the chief financial officer of InnoVida. He had a master's degree in business administration from the Wharton School of Business, and he had previously worked as an audit partner for a large accounting firm and as chief financial officer for a Fortune 500 company.

InnoVida was a holding company for several subsidiary companies. It manufactured panels for rapidly built structures, and it marketed them as energy efficient. But InnoVida never earned significant revenues from selling these panels. It instead made most of its revenue by selling "factories in a box," which were joint ventures to build factories to manufacture the panels.

Toll, with the help of others, prepared two sets of unaudited financial statements for InnoVida. The main difference between the statements was how the sets recognized revenue from the factories in a box. And that difference meant that each set reported a major difference in profitability.

One set of statements recognized revenue on a deferred basis. That is, when InnoVida received revenue for a factory, it was offset with a liability that reflected the progress of construction on the factory. As construction of the factory progressed, more of the revenue was recorded as earned. This first set of statements reported that InnoVida was losing millions of dollars.

The other set of statements recognized revenue in full as soon as InnoVida received payment for a factory, even if construction was incomplete. This second set of statements was labeled "pro forma." It reported substantial profits.

Together with Claudio Osorio, the owner and majority shareholder of InnoVida, Toll participated in two schemes, the first of which involved private investors. Osorio and others solicited individuals to invest directly in InnoVida or

enter into joint ventures for "factories in a box." InnoVida structured the joint ventures so that the investors would own fifty percent of the equity in exchange for their capital contributions, and InnoVida would own the other fifty percent in exchange for providing equipment. When it provided that equipment, InnoVida marked up the price by about 100 percent.

Toll and Osorio misrepresented some facts to investors and omitted others. They provided the investors with the pro forma statements reporting substantial profits, but no one told the investors about the other set reporting significant losses. They also told some investors that Osorio was not receiving a salary, but Osorio funneled substantial corporate funds to a personal account. And neither Toll nor Osorio revealed that InnoVida used deposits from some investors to pay others.

The second scheme involved a loan from the Overseas Private Investment Corporation, an agency of the United States. A managing director of the Investment Corporation explained that its "mission is to help people in [developing] countries to improve their economic position while, at the same time, helping U.S. businesses to grow their markets and develop their business." Osorio and Toll obtained a $10 million loan from the Investment Corporation for a purported project in Haiti. The Investment Corporation disbursed $3.2 million of the loan, and Osorio and Toll used the majority of it for improper purposes, such as repaying other investors and funding Osorio's personal account. When InnoVida

sought the remainder of the loan, the Investment Corporation requested records to verify that InnoVida had complied with the terms. InnoVida provided the Investment Corporation with false documents about its use of the loan proceeds, about its equity contribution to the Haiti project, and about purported contracts it secured in Haiti. Suspecting fraud, the Investment Corporation never disbursed the remaining proceeds.

A federal grand jury indicted Toll and Osorio for their participation in both schemes. It indicted Toll for two counts of conspiracy to commit wire fraud, 18 U.S.C. § 1349, fifteen counts of wire fraud, *id.* § 1343, one count of major fraud against the United States, *id.* § 1031(a), three counts of making false statements to a federal agency, *id.* § 1001(a)(3), and one count of conspiracy to engage in a monetary transaction with criminally derived property, *id.* § 1956(h).

At trial, the government introduced evidence to prove Toll's participation in, and knowledge of, both schemes. Lewis Carness, the controller at InnoVida, testified about how the accounting department operated. Although Toll initially was a signatory for most of the bank accounts, he was removed in 2009 and had to receive bank statements from another employee, Elba Gamboa. This change occurred after Osorio's wife, who did not have an official title but managed some aspects of InnoVida, became upset with Toll and Carness for installing an

expensive accounting system. She reduced both of their salaries, instructed Carness to report directly to her, and tried "to isolate" Toll from the company.

Carness explained that the accounting department prepared two sets of financial statements. When the prosecutor asked Carness to explain what "deferred revenue" is, Toll objected. The district court overruled the objection and stated, "[H]e's not testifying as an expert. I'll allow him to testify as to what happened, his involvement with it, but not as an expert." The government then asked Carness to explain the "deferred revenue" section of the financial statements.

Later, without objection from Toll, Carness testified that, when he prepared the statements, he believed that the ones using deferred revenue complied with the Principles and the ones using full recognition of revenue did not:

> Q.    The statements that [used deferred revenue,] . . . [w]ere those statements done according to what we call GAAP, G-A-A-P?
>
> A.    It was done according to our best interpretation of the GAAP rules relating to it. It was our understanding that when we went through the audit, the auditors would review those methods to validate them. We had early discussions with them about the methods and received preliminary, you know, agreement from them about the methods used.
>
> . . . .
>
> Q.    Okay. Those entries [using full recognition of revenue] were never booked into the accounting system?
>
> A.    No.
>
> Q.    Okay. Why not?

A.    Because the accounting system is supposed to . . . reflect the method of accounting that you use for GAAP purposes, for purposes of providing financials for the audit. This was merely an alternate presentation of financials.

Q.    And . . . was this alternate presentation according to GAAP?

. . . .

A.    To the . . . best of my knowledge, it was not.

The prosecutor then asked Carness to explain what the phrase "Generally Accepted Accounting Principles" meant, and Toll objected. The district court allowed Carness to testify "based on his experience." Carness explained his understanding of the Principles:

It's a general guideline for accountants to use based on pronouncements by a nongovernmental body called the Financial Accounting Standards Board . . . . [T]here are various levels, ranging from pronouncements by that body all the way down to industry standards and norms . . . . It's not a set of rules like the IRS has regulations.

. . . .

GAAP standards were done so that companies would treat transactions consistently between entities so that their financials could be comparable.

Later, the prosecutor asked Carness if InnoVida was "a profitable company," to which Toll again objected. The district court overruled the objection, and Toll replied, "I believe not on a GAAP basis."

The government presented other evidence about how InnoVida used the two sets of statements for different purposes. The set of statements reporting losses was recorded in the official accounting system, and when Toll discussed the possibility of an external audit with Ernst & Young, he provided them with this set. But the set reporting profits was provided to the board of directors of InnoVida, to its investors, and to the Investment Corporation. Besides the label "pro forma," those statements had no notations that could have explained the underlying assumptions or that the statements differed from those kept in the official accounting system.

Ryan Freedman invested over $5 million in InnoVida. He believed the company was "in very good shape" based on the pro forma statements that he received, and the statements were "a large part of [his] investment decision." When Freedman consolidated his two investments in factories in a box, he became a member of the board of directors. Freedman continued to receive the pro forma statements, and Toll made at least one presentation to the board about the financial status of InnoVida. Freedman received "approximately [$]1.6, $1.7 million in repayment" on his investment. But some of those payments were late, and Toll convinced Freedman not to hold InnoVida in default so that InnoVida could obtain its loan from the Investment Corporation. Freedman did not understand why InnoVida could not repay him, given that a financial statement shown to the board reported that InnoVida had $39 million in cash. On another occasion, Toll

represented that a wire transfer had been made to satisfy a repayment obligation to Freedman, but the documentation for that transfer was spurious.

Bernie Carballo was a board member of InnoVida before investing in the company. At board meetings, Toll and Osorio represented to him that "the company was doing well and that [it was] heading in the right direction." Toll never explained the nature of the pro forma statements that he gave to the board. Osorio approached Carballo for a short-term loan for InnoVida, and based on what Carballo knew about the finances of InnoVida, he lent $1 million to the company. Carballo received some interest payments, but he never recouped his principal. Toll represented to Carballo that InnoVida made a wire transfer to repay the loan, but as with Freedman, the documentation was spurious.

The government also introduced evidence about Toll's participation in the scheme to obtain a loan from the Investment Corporation. Lynn Tabernacki, a representative of the Investment Corporation, testified that she dealt with Toll "[p]redominantly," by which she meant "90 percent of the time." Shortly after the earthquake in Haiti, the Investment Corporation loaned InnoVida $10 million so that InnoVida could build a factory in Haiti that would sell panels to individuals who wanted to construct homes rapidly. The agreement also required InnoVida to construct panels at its existing factories to sell to third-party vendors and to assign those contracts to the Investment Corporation as security. When applying for the

loan, Toll sent Tabernacki the pro forma statements but never explained the assumptions underlying them or disclosed that InnoVida maintained another set of financial records. The loan required InnoVida to use the proceeds only for the project in Haiti, to make an equity investment of $5 million in the project, and to submit periodic financial statements that complied with the Principles.

After the Investment Corporation approved the loan, InnoVida requested disbursement of half of the proceeds and provided documentation of an alleged equity contribution of $2.5 million. Shortly after that request, InnoVida transferred $1 million of the contribution to a subsidiary, purportedly as advance funding to produce panels. Toll also provided updated pro forma statements to the Investment Corporation, again with no disclosures.

The Investment Corporation eventually approved a disbursement of $3.2 million. InnoVida used most of these proceeds for purposes unrelated to the Haiti project, such as repaying investors and funding a company owned by Osorio. Shortly after receiving the initial disbursement, Toll recorded on the general ledger an investment of $2,080,000 in the Haiti project, which ostensibly represented a purchase of machinery and equipment for the factory in Haiti. But Toll later reversed this entry because the transfer never occurred.

A few months later, InnoVida requested the remainder of the loan proceeds, and the Investment Corporation required InnoVida to submit records to verify that

it had complied with the terms of the loan. Tabernacki requested records about how InnoVida had used the first disbursement. Toll sent her documents that reported that InnoVida had paid $2,080,000 to one of its subsidiaries for machinery and equipment; $1,689,993 to another subsidiary for purchases to fulfill a contract for panels; and $1,929,804 to the same subsidiary to fulfill another contract. Tabernacki was not satisfied and requested additional information about these disbursements. After Gamboa drafted additional documents, Toll asked her to make changes because he thought some "items could have been done better." Later, someone from InnoVida submitted bank statements to Tabernacki, but some of the statements had withdrawal information deleted so that the payments to investors and Osorio's personal account were not reflected.

Tabernacki also requested that InnoVida provide records of its $2.5 million equity contribution to the Haiti project. An attorney for InnoVida emailed Tabernacki, and copied Toll, with a one-page document purporting to be a bank record for a $2.5 million deposit. Around this time, Toll asked Carness to make an entry in the accounting system for a cash transfer of $2.5 million because InnoVida "had missed some deadline," but Carness refused to make the entry because "the cash wasn't there." Tabernacki requested additional information, and someone sent her the bank records for the Haiti project. Upon inspection, Tabernacki discovered

that the "tracing number" for the purported $2.5 million contribution was actually a $500,000 deposit from another investor.

InnoVida also submitted documents purportedly reflecting two contracts to sell panels in Haiti. First, an attorney for InnoVida submitted an email stating that World Vision, a nongovernmental organization, had "awarded Innovida a total of 10,000 [panels]." The email was from Osorio to Toll with a forwarded message from Lisa Guiterrez Brito, identified as the emergency relief station head for World Vision. The email was fabricated: World Vision never entered into such a contract, no one named Lisa Gutierrez Brito worked for World Vision, and no one at World Vision had the job title "emergency relief station head." Second, Toll submitted an email to Tabernacki reporting that Royal Caribbean Cruises had entered into a deal with InnoVida. Toll stated that he "thought [the Investment Corporation] should be aware of the latest win in Haiti. Royal Caribbean has approved a $3.2 million project." Attached was a purported message to Osorio from an associate vice president of Royal Caribbean that "confirmed [the order] at your proposed value of $3,275Mill" and stated that the email was "your notice to proceed." The message from the associate vice president was altered: the actual message stated that "if we are at $275k . . . I want to move forward with this." The representative testified that Toll was present at meetings where the representative made clear that Royal Caribbean would not spend more than $300,000.

At the close of evidence, Toll moved for a judgment of acquittal, Fed. R. Crim. P. 29. The district court acquitted Toll of six substantive counts of wire fraud with regard to the investors. The district court denied Toll's motion about the other counts.

In its closing argument, the government mentioned Carness's testimony about the two sets of financial statements, but it did not discuss whether the statements complied with the Principles. It explained instead that Toll sent one set of statements to potential auditors and a different set to the Investment Corporation and investors when he knew that InnoVida was losing money according to the first set. It also mentioned that the contract between InnoVida and the Investment Corporation required that InnoVida submit financial statements prepared according to the Principles but that InnoVida submitted statements labeled "pro forma" that did not comply with the Principles.

The jury convicted Toll of two counts of conspiracy to commit wire fraud, three counts of wire fraud, one count of major fraud against the United States, three counts of making a false statement to the United States, and one count of conspiracy to engage in a monetary transaction with criminally derived property. The jury acquitted Toll of the six remaining counts of wire fraud. The district court sentenced Toll to 48 months of imprisonment and three years of supervised release, and it ordered him to pay $3.3 million in restitution.

## II. STANDARDS OF REVIEW

Two standards of review govern this appeal. First, we ordinarily review the admission of lay testimony for abuse of discretion. *United States v. Myers*, 972 F.2d 1566, 1575 (11th Cir. 1992). "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous." *Citizens for Police Accountability Political Comm. v. Browning*, 572 F.3d 1213, 1216–17 (11th Cir. 2009). But if a party "fail[s] to object [at trial] to the admission of evidence on a particular ground," we review for plain error. *United States v. Langford*, 647 F.3d 1309, 1325 n.11 (11th Cir. 2011). Second, "[w]e review *de novo* whether there is sufficient evidence in the record to support a jury's verdict in a criminal trial, viewing the evidence in the light most favorable to the government, and drawing all reasonable factual inferences in favor of the jury's verdict." *United States v. Jiminez*, 564 F.3d 1280, 1284 (11th Cir. 2009). The defendant must do more than "put forth a reasonable hypothesis of innocence, because the issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt." *United States v. Thompson*, 473 F.3d 1137, 1142 (11th Cir. 2006).

### III. DISCUSSION

We divide our discussion in two parts. First, we explain that the district court did not abuse its discretion when it allowed Carness to testify about whether he believed, when he created them, that the financial statements complied with the Principles. Second, we explain that sufficient evidence supports each of Toll's convictions.

### A. *The District Court Did Not Abuse Its Discretion by Admitting Carness's Testimony.*

Toll argues that the district court abused its discretion when it allowed Carness to testify about whether Toll's accounting methods complied with Generally Accepted Accounting Principles. He contends that, because Carness was not qualified as an expert and "[d]eterminations of whether an accounting decision complies with or violates [the Principles] require the application of technical or other specialized knowledge," Carness's testimony was inadmissible under Federal Rule of Evidence 702. The government responds that the testimony was largely factual, but if there was any opinion testimony, it was "admissible as lay opinion under Rule 701 because it was based on facts he had perceived as an accountant and controller for InnoVida."

As a threshold matter, the parties dispute our standard of review. The government argues that we should review for plain error because Toll never objected to the testimony that he now challenges, but Toll argues that he timely

objected to Carness's testimony at trial. Because Toll loses under either standard, we need not decide this issue and instead review for abuse of discretion.

The district court did not abuse its discretion. A lay witness like Carness may offer factual testimony so long as he "has personal knowledge of the matter," Fed. R. Evid. 602, and opinion testimony if the testimony is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702," Fed. R. Evid. 701. Carness testified to the fact that he believed, when he created the statements, that some of them complied with the Principles and others did not. A witness provides "factual statements" when he gives a "summary of financial records," *United States v. Ransfer*, 749 F.3d 914, 938 (11th Cir. 2014), and explains how the records were created. Contrary to Toll's argument, Carness did not testify as to whether the accounting methods utilized by Toll actually complied with the Principles. Instead, he testified about which statements were "done according to [his] best interpretation of [the Principles]." "To the . . . best of [his] knowledge," he believed that, when the statements were prepared, one set complied with the Principles and the other did not. What Carness believed when he prepared the statements is a question of fact, so the district court did not err by permitting this testimony.

Even if some of Carness's testimony was opinion testimony, it was admissible under Rule 701. We have held that "Rule 701 does not prohibit lay witnesses from testifying based on particularized knowledge gained from their own personal experiences." *United States v. Moran*, 778 F.3d 942, 967 (11th Cir. 2015) (quoting *United States v. Hill*, 643 F.3d 807, 841 (11th Cir. 2011)). Specifically, a "business owner[] or officer[]" may provide lay opinion testimony "because of the particularized knowledge that the witness has by virtue of his or her position in the business." *Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*, 320 F.3d 1213, 1222 (11th Cir. 2003) (emphasis omitted) (quoting Fed. R. Evid. 701 advisory committee's notes to 2000 amendments). Carness's testimony falls within Rule 701. He was the controller of InnoVida and had "at least 18 years of experience" as an accountant. He testified whether he believed then that the different statements he prepared complied with the Principles as he understood them. This testimony was rationally based on his "own personal experiences," *Hill*, 643 F.3d at 841, and "particularized knowledge that [he] ha[d] by virtue of his . . . position" in InnoVida, *Tampa Bay Shipbuilding & Repair*, 320 F.3d at 1222 (emphasis omitted) (quoting Fed. R. Evid. 701 advisory committee's notes to 2000 amendments). Because the testimony was admissible, the district court did not abuse its discretion.

*B. Sufficient Evidence Supports Each of Toll's Convictions.*

Toll argues that the evidence was insufficient to support each of his ten convictions, but we disagree. Sufficient evidence supports Toll's convictions.

1.  Conspiracy to Commit Wire Fraud (Counts 1 and 10)

The jury convicted Toll of one count of conspiracy to defraud investors using the wires and one count of conspiracy to defraud the Investment Corporation using the wires. Under the federal wire fraud statute, it is unlawful to "transmit[] or cause[] to be transmitted by means of wire . . . communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing" a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343. "Any person who . . . conspires to commit [wire fraud] shall be subject to the same penalties as those prescribed for" wire fraud. *Id.* § 1349.

To sustain a conviction for conspiracy, "the government must prove (1) 'the existence of an agreement to achieve an unlawful objective'; (2) 'the defendant['s] knowing and voluntary participation in the conspiracy'; and (3) 'an overt act in furtherance of the conspiracy.'" *United States v. McQueen*, 727 F.3d 1144, 1153 (11th Cir. 2013) (alteration in original) (quoting *United States v. Ibarguen-Mosquera*, 634 F.3d 1370, 1385 (11th Cir. 2011)). "The very nature of conspiracy frequently requires that the existence of an agreement be proved by inferences

from the conduct of the alleged participants or from circumstantial evidence of a scheme." *United States v. Molina*, 443 F.3d 824, 828 (11th Cir. 2006) (quoting *United States v. Ayala*, 643 F.2d 244, 248 (5th Cir. Unit A April 1981)). "A conspiracy conviction will be upheld . . . when the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can be fairly attributed to him," *id.* (alteration in original) (quoting *United States v. Figueroa*, 720 F.2d 1239, 1246 (11th Cir. 1983)), but the "inference of participation from presence and association with conspirators alone does not suffice to convict," *United States v. Perez-Tosta*, 36 F.3d 1552, 1557 (11th Cir. 1994). "[A] defendant can be convicted even if his or her participation in the scheme is 'slight' by comparison to the actions of other co-conspirators." *United States v. Toler*, 144 F.3d 1423, 1428 (11th Cir. 1998).

    a.  <u>Conspiracy to Defraud the Private Investors Using the Wires (Count 1)</u>

Toll argues that the government "failed to prove [that] Osorio and Toll formed any agreement" or that Toll had any "knowledge of Osorio's criminal scheme to defraud investors." The government responds that it introduced sufficient evidence from which "the jury was free to consider Toll's actions, or lack thereof . . . , to infer that Toll was knowingly involved in the fraud conspiracies." We agree with the government.

The government presented sufficient evidence for a jury to find beyond a reasonable doubt that Toll knew Osorio was misrepresenting the financial strength of InnoVida and agreed to assist Osorio in his deceit. Toll oversaw the preparation of two sets of financial statements. One set recognized revenue in full immediately and reported substantial profits; the other set deferred recognition of revenue and reported substantial losses. Ordinarily, financial statements using immediate revenue recognition are used for internal management, but Toll often presented those statements to investors. Those statements were also the ones presented to the board, and Toll did not qualify his representations that InnoVida was profitable. Toll recorded the other set of financial statements in the official accounting system and gave them to Ernst & Young when he explored the possibility of an external audit. Although the statements showing profits were labeled "pro forma," they contained no disclosures to alert anyone outside of management that the statements differed from the other set in the accounting system, and no one explained what "pro forma" meant. Based on Toll's preparation of two sets of financial statements and his suspicious use of them, the jury could reasonably infer that Toll agreed to help Osorio misrepresent the financial strength of InnoVida.

Toll argues that the evidence is insufficient because it proves that he and Osorio "continually worked at cross purposes," to the point that the Osorios shut him out of decisionmaking. Toll argues that he presented evidence that he

"implement[ed] a transparent, well-structured accounting system"; he did not have direct access to the bank accounts for InnoVida; and the Osorios "systematically undermined [his] efforts toward financial transparency."

Toll's argument fails. That he took some steps towards a transparent accounting system does not mean that a jury could not reasonably find he also participated in the schemes. As to the issue of Toll's isolation, the government presented evidence that the Osorios took their actions because Osorio's wife was frustrated with the cost of the accounting system. The government also presented evidence that Toll prepared and submitted the statements to InnoVida's investors and the Investment Corporation without qualifying his ability to verify the information. In other words, Toll continued to behave toward outsiders as they would expect a chief financial officer to behave. Because Toll was a well-educated and experienced officer, the jury could have reasonably disbelieved Toll's evidence that he worked at cross purposes with the Osorios.

Toll also argues that the jury could not have found that he intended to mislead investors with the financial statements because the government failed to prove that the statements did not comply with the Principles, but the government did not need to prove that the statements violated the Principles or that Toll knew they did. The government was required only to "pro[ve] . . . a material misrepresentation." *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir.

2009). The material representation was the unqualified disclosure that InnoVida was making substantial profits when the official accounting system for InnoVida reported substantial losses. The government presented sufficient circumstantial evidence to prove that Toll conspired to make this material misrepresentation.

Toll argues that the government failed to prove that he shared the "conspiratorial goals" because "no evidence [proved] that Toll sought to unlawfully enrich himself or Osorio," but we disagree. That Toll never directly received the proceeds of the fraud is immaterial. As the government explains, "[b]y playing along with the fraud scheme, Toll was able to remain employed in a management position, and received a respectable salary for allowing the fraud scheme to fester unabated."

Toll also argues that there is no evidence that he solicited and recruited investors, but we again disagree. Although Toll attempts to minimize his role, "a defendant can be convicted even if his . . . participation in the scheme is 'slight.'" *Toler*, 144 F.3d at 1428. Toll never solicited investors himself, but the government presented evidence that he assisted Osorio in doing so. Toll created the financial statements and knew that they would be presented to investors. Moreover, Toll repeatedly reported to the board, including investors Carballo and Freedman, that the company was prospering. This evidence proves that Toll's participation in the scheme was more than slight and is more than sufficient to sustain his conviction.

b.  Conspiracy to Defraud the Investment Corporation Using the Wires
(Count 10)

Toll also argues that he "did not knowingly and intentionally submit false information and documents to [the Investment Corporation] about purported contracts, the use of loan proceeds, or an equity contribution." He concedes that these documents were false but argues that the evidence failed to prove that he knew of or participated in the fraud. We disagree for three reasons.

First, sufficient evidence established that Toll knew the loan proceeds were not used in accordance with the contract. When Tabernacki asked for records about how the proceeds were used, Toll sent her documents that reported InnoVida had transferred money to pay for machinery, equipment, and panels, including a transfer of $2,080,000 to one of its subsidiaries. The general ledger establishes that Toll knew some of this information was false before he sent it to Tabernacki because he had already reversed an entry for the $2,080,000 payment. And other evidence established that, when Tabernacki was not satisfied, Toll suggested to another employee ways the documents "could [be] done better." Based on this evidence, the jury could reasonably infer that Toll was aware the loan proceeds were used improperly.

Second, sufficient evidence established that Toll knew he misrepresented whether InnoVida made its required equity contribution. Toll, through an attorney for InnoVida, submitted a document purportedly reflecting a $2.5 million equity

contribution, but the transaction had the same tracing number as a $500,000 deposit from an investor. Carness testified that Toll asked him to make an entry in the accounting system for the transfer of $2.5 million, but Carness refused to make the entry because the transfer never happened. The jury could reasonably infer from this evidence that, when Toll sent the document to Tabernacki, he knew that InnoVida had never made its contribution.

Third, sufficient evidence established that Toll knew the two purported contracts were false. With respect to Royal Caribbean, Toll forwarded an email that was altered to evidence a deal for $3,275,000, instead of $275,000. A representative from Royal Caribbean testified that, at meetings with Toll, he made clear that the contract would not exceed $300,000. And with respect to World Vision, the government presented significant circumstantial evidence that Toll knew the document was false. In addition to the direct evidence that Toll had submitted other false documents, the language in the altered document from Royal Caribbean was similar to the language in the altered document from World Vision, giving rise to an inference that Toll at least knew the email was altered. Toll was also the chief financial officer and in charge of recording payments for contracts on the general ledger. The jury could reasonably infer from this evidence that Toll knew that both of the purported contracts were false.

2.  Conspiracy to Engage in a Monetary Transaction with Criminally
Derived Property Worth More Than $10,000 (Count 22)

It is unlawful, subject to certain jurisdictional limits not challenged in this appeal, to "knowingly engage[] . . . in a monetary transaction in criminally derived property of a value greater than $10,000" that "is derived from specified unlawful activity," including wire fraud. 18 U.S.C. § 1957. It is also unlawful to "conspire[] to commit [that] offense." *Id.* § 1956(h). Toll reasserts his earlier arguments that the evidence failed to establish knowledge of unlawful activity, but as we explained above, the government introduced sufficient evidence that Toll knew of the fraudulent activity.

Toll argues that the evidence establishes that he never "move[d] . . . money," but the government was not required to prove that he did. The Supreme Court has held that to sustain a conviction for conspiracy to engage in transactions prohibited by section 1956(h), the government is not required to prove any overt act in furtherance of the conspiracy. *Whitfield v. United States*, 543 U.S. 209, 219, 125 S. Ct. 687, 694 (2005). The government must prove only an "agreement between two or more persons to commit a money-laundering offense" and "knowing and voluntary participation in that agreement by the defendant." *United States v. Broughton*, 689 F.3d 1260, 1280 (11th Cir. 2012).

The government presented sufficient evidence of both elements of the charged conspiracy. InnoVida used the proceeds of the loans to repay disgruntled

investors and fund Osorio's personal account, neither of which were approved uses. Other evidence, including evidence that Toll reversed an entry in the general ledger, further established that Toll knew of and assisted in the improper uses of the funds. This participation was all that was required to sustain Toll's conviction for conspiracy to launder money.

### 3.  Wire Fraud (Counts 14, 15, and 17)

The jury could have reasonably found that Toll committed the three counts of wire fraud related to the Investment Corporation. Wire fraud consists of "transmit[ting] or caus[ing] to be transmitted by means of wire . . . communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing" a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343. Toll does not dispute that the communications were made in furtherance of a scheme; he argues only that "the government failed to prove Toll knew of or participated in the fraudulent scheme." But for the same reasons that there is sufficient evidence of the conspiracy to defraud the Investment Corporation, there is sufficient evidence that Toll "knew of or participated in the fraudulent scheme" for purposes of these counts.

4.  Major Fraud Against the United States (Count 18)

The jury also could have reasonably found that Toll committed major fraud against the United States. As applied here, that offense involves "knowingly execut[ing] . . . any scheme or artifice with the intent . . . to defraud the United States . . . in any . . . loan . . . if the value of such . . . loan . . . is $1,000,000 or more." 18 U.S.C. § 1031(a). Section 1031(a) "sweep[s] broadly to . . . cover fraud not only in the making of the contract, but also in the *execution* of the contract." *United States v. Nolan*, 223 F.3d 1311, 1315 n.5 (11th Cir. 2000). Toll again argues that the evidence is insufficient because the government failed to prove knowledge of, or participation in, any fraudulent scheme. The evidence was sufficient for the same reasons we discussed in affirming his conviction for conspiracy to commit wire fraud.

5.  Making False Statements to a Federal Agency (Counts 19–21)

The jury convicted Toll of three counts of making false statements to a federal agency. It is unlawful, "in any matter within the jurisdiction of the executive . . . branch of the Government of the United States, [to] knowingly and willfully . . . make[] or use[] any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry." 18 U.S.C. § 1001(a). A statement is material if it has "a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was

addressed." *United States v. Gaudin*, 515 U.S. 506, 509, 115 S. Ct. 2310, 2313 (1995) (quoting *Kungys v. United States*, 485 U.S. 759, 770, 108 S. Ct. 1537, 1546 (1988)). "The government is not required to prove that the statement had actual influence." *United States v. Boffil-Rivera*, 607 F.3d 736, 741 (11th Cir. 2010).

a.  The False Statement About Royal Caribbean (Count 20)

The jury convicted Toll of submitting a document falsely stating that InnoVida had entered into a contract with Royal Caribbean for $3.2 million. Toll does not deny that the document was false, but argues that there was no evidence that he "knew the document was fabricated" or that it was material. We reject both arguments.

The jury could have reasonably found that Toll knew that the document was false and that it was material. Toll sent the document to Tabernacki, and the document reported a contract price of $3,275,000, not $275,000. Although it is uncertain who altered the email, a representative from Royal Caribbean testified that Toll attended meetings where Royal Caribbean made clear that the contract would not exceed $300,000. Even if Toll did not alter the email himself, a reasonable jury could have found that Toll knew the document was false when he submitted it to the Investment Corporation. And the document was material because it represented that Royal Caribbean was entering into a contract with InnoVida worth "$3,275Mill" and that InnoVida should "consider this e-mail as [a]

notice to proceed." Such a large contract, which would be assigned to the Investment Corporation, had "a natural tendency to influence" the decisions of the Investment Corporation. *Gaudin*, 515 U.S. at 509, 115 S. Ct. at 2313 (quoting *Kungys*, 485 U.S. at 770, 108 S. Ct. at 1546).

b.  The False Statement About the Equity Contribution (Count 21)

The jury also convicted Toll of causing the submission of a materially false document stating that InnoVida had made a required equity contribution of $2.5 million. *See* 18 U.S.C. §§ 1031, 2. Toll does not dispute that the document was false, but argues that the evidence fails to establish that he "caused it to be submitted" or that "he knew the document was fabricated."

As with the other documents, the jury could have reasonably found that Toll caused the document to be submitted to the Investment Corporation. Although an attorney for InnoVida submitted the document, Toll ordinarily sent all of the documents to the attorneys for submission to the Investment Corporation. And Toll was the only employee of InnoVida who was copied on the email to the Investment Corporation. Based on this evidence, the jury could have reasonably found that Toll caused the document to be submitted to the Investment Corporation.

The jury also could have reasonably found that Toll knew the document was false. Before submitting the false document, Toll asked Carness to make an entry in the accounting system for the transfer of $2.5 million, and Carness refused

because it was not supported by the bank records. The document that Toll submitted also bore the same tracing number as a $500,000 deposit from another investor. Based on this evidence, the jury could have reasonably inferred that Toll knew that the document was false when he submitted it to the Investment Corporation.

### c. The False Statement About World Vision (Count 19)

Finally, the jury convicted Toll for causing an attorney for InnoVida to submit a document falsely stating that InnoVida had entered into a contract with World Vision for the sale of 10,000 shelters in Haiti. Toll does not deny that the document was false, but he argues that the government failed to establish that he "caus[ed] the document to be submitted," that "he knew the document was fabricated," and that the document was material. We disagree.

The jury could have reasonably found that Toll caused the document to be submitted to the Investment Corporation. An attorney for InnoVida sent the document to the Investment Corporation, and the attorney testified that it was "very possible" that Toll sent him the document. The government also presented testimony that documents submitted to the attorneys "principally" came from Toll, and the document that the attorney sent to the Investment Corporation was a copy of a message from Osorio to Toll. Based on this evidence, someone with access to either Osorio's or Toll's email must have submitted the document to the attorney,

and a jury could reasonably infer that Toll submitted the email because he ordinarily submitted the documents to the attorneys.

The jury also could have reasonably found that Toll knew the document was false. The government established that Toll conspired to defraud the Investment Corporation, and it presented direct evidence that Toll knew he submitted at least two other false documents—one about the purported contract with Royal Caribbean and another about the purported equity contribution. Moreover, the language in the altered document from Royal Caribbean is similar to the language in the altered document from World Vision. Toll was also the chief financial officer, so he was responsible for recording any contract payments on the general ledger. Based on this significant circumstantial evidence, the jury could make the reasonable inference that Toll knew that this document was false. *See United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011).

Moreover, the jury could have reasonably found that the document was material. Toll argues that the document was not material because the email does not use the word "contract," and because Tabernacki testified that she did not "put any value" in the email. Although Toll is correct that the document does not use the word "contract," the document states that World Vision "ha[s] awarded InnoVida a total of 10[,]000 Units" and that InnoVida should "consider this e-mail a notice to proceed with production and mobilization." Even assuming that

document is not a contract itself, the email communicates that a deal had been struck. It is irrelevant that Tabernacki was not actually influenced by the document. *See Boffil-Rivera*, 607 F.3d at 741. InnoVida was required to assign its contracts to the Investment Corporation as security for the loan, so a large contract was material because it would have "a natural tendency to influence" the decisions of the Investment Corporation. *Gaudin*, 515 U.S. at 509, 115 S. Ct. at 2313.

## IV. CONCLUSION

We **AFFIRM** Toll's convictions.