[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-11780

_____

D.C. Docket No. 1:13-cr-00268-WS-C-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TRAVIS EDWARD GROSS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(October 12, 2016)

Before WILSON and MARTIN, Circuit Judges, and RODGERS,[*] District Judge.

PER CURIAM:

_____

[*] Honorable Margaret C. Rodgers, Chief United States District Judge, Northern District of Florida, sitting by designation.

Travis Gross was charged, tried, and convicted of conspiracy to smuggle a drug known as XLR11 into the United States and to introduce that drug into interstate commerce as misbranded, in violation of 18 U.S.C. §§ 371, 542, 545, and 21 U.S.C. §§ 331, 333(a)(2) (Count One); as well as three counts of money laundering, in violation of 18 U.S.C. § 1957 (Counts Four, Five, and Six); and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Seven).[1]  Gross was sentenced to 156 months' imprisonment.  He now appeals his convictions and sentence.  Having carefully reviewed the matter and with the benefit of oral argument, we affirm.

I.

ZenBio, LLC ("ZenBio") produced and sold smokable "designer" drugs commonly known as "spice," which were manufactured with the synthetic drug XLR11.  Travis Gross was responsible for ordering ZenBio's supply of XLR11. The indictment charged Gross and others with a conspiracy to smuggle and misbrand XLR11 from November 20, 2012, through June 25, 2013.  Although XLR11 was not a federally controlled substance until May 16, 2013, the record establishes that at all relevant times, XLR11 was a "drug" subject to FDA labeling

---

[1] Additionally, Gross was charged in Counts Two and Three with conspiracy to import and to distribute "controlled substance analogues," 21 U.S.C. §§ 802(32)(A), 846, 963, but these charges were dismissed before trial.

2

and branding laws,[2] that it became a controlled substance in Florida in December 2012, and that law enforcement was seizing XLR11 during the entire period.[3]

ZenBio followed the ordinary "industry" model used by designer drug businesses, which was described at trial by Special Agent Scott Albrecht of the Drug Enforcement Administration ("DEA"). Agent Albrecht explained that "synthetic cannabinoids" are "designer drugs" developed from a nonorganic source and intended to produce effects similar to THC, the active ingredient in marijuana.[4] By 2008, synthetic cannabinoids had become part of a designer drug market in the United States for smokable products intended to circumvent existing drug laws. According to Agent Albrecht, a cycle developed in which new drugs emerged quickly whenever an existing synthetic cannabinoid was added to the list of controlled substances under state or federal law, making it difficult for the laws to keep up. The newest drugs on the market could be sold for a huge profit. Thus, there was an industry incentive to develop and market the next "legal" smokable

---

[2] Under the Federal Food Drug and Cosmetic Act, a "drug" means an "article[] (other than food) intended to affect the structure or any function of the body of man or other animals." 21 U.S.C. § 321(g)(1)(C). The Federal Food Drug and Cosmetic Act prohibits delivering or introducing any misbranded drug into interstate commerce. 21 U.S.C. § 331(a).

[3] The parties stipulated that the imported packages and products seized in this case contained XLR11.

[4] Agent Albrecht explained that synthetic designer drugs are designed to imitate the effects of other substances and said that LSD and MDMA, also known as ecstasy, are among the list of well-known and now-illegal synthetic drugs.

3

product before the drug was listed as a controlled substance.  In the months

preceding the July 9, 2012 effective date of the Synthetic Drug Abuse Prevention

Act, which banned several synthetic drugs, the industry was already beginning to

produce XLR11 and its close "chemical sister," UR 144, to replace a drug called

AM2201 in an anticipation of the new law.[5]  XLR11 was temporarily listed as a

Schedule I federally controlled substance on May 16, 2013, and was permanently

scheduled on May 11, 2016.[6]

Agent Albrecht explained that the industry's shift to XLR11 as the newest

synthetic designer drug did not escape the attention of law enforcement.  Some

states had already begun to ban the substance; in Florida, for instance, XLR11

became a listed controlled substance in December 2012.  Albrecht testified that 99

percent of the time, XLR11 and all other synthetic cannabinoids were imported

from China, and often ordered online.  He stated, however, that as legislation

---

[5] Agent Albrecht explained that after the first synthetic cannabinoid, JWH 018, was temporarily scheduled, which occurred in March 2011, the industry began producing AM2201. Both of these drugs became permanently scheduled controlled substances with the enactment of the Synthetic Drug Abuse Prevention Act on July 9, 2012.

[6] On May 16, 2013, the DEA published a notice stating that XLR11 was being temporarily paced on Schedule I as an illegal substance as of that date. *See* Schedules of Controlled Substances: Temporary Placement of Three Synthetic Cannabinoids in Schedule I, 78 Fed. Reg. 28735-01, 2013 WL 2060961 (May 16, 2013) (also providing 30 days for manufacturers who register with the DEA to comply with federal regulations).  The temporary placement was effective for three years, and XLR11 was recently permanently added as a Schedule I controlled substance on May 11, 2016.  *See* Schedules of Controlled Substances: Placement of UR-144, XLR11, and AKB48 into Schedule I, 81 Fed. Reg. 29142-01, 2016 WL 2643646 (May 11, 2016) (Final Rule permanently placing XLR11 in Schedule 1); *see also* 21 C.F.R. 1308.11(d)(49) (2016).

4

designed to preclude the use of synthetic drugs increased, online ordering ceased, and the majority of the orders were placed by telephone and email instead, with payment sent by wire transfer.

In an effort to avoid detection and possible seizure at ports of entry, importers divided XLR11 into smaller packages, which were shipped to busy ports of entry with hopes of the substance having a better chance of passing through customs. Agent Albrecht also testified that XLR11 shipments were often mislabeled as detergent or research chemicals. Special Agent Christopher Marshall, with the United States Customs and Border Protection agency, testified that customs officers often inspected and seized packages of chemicals or drugs from China labeled with suspicious names such as pearl powder, clean powder, sodium dioxide, bora nitro, or other very generic chemical descriptions, knowing that illicit drugs were regularly being imported from China, usually with a false declaration or bill of lading. Marshall had seen these names repeatedly on packages from China and said that when inspected, the packages were found to contain XLR11 instead of the chemical or product listed. Neither Albrecht nor Marshall had seen any packages with XLR11 listed on the bill of lading, despite federal law requiring an accurate description of a package's contents.[7]

---

[7] Federal law prohibits smuggling goods into the United States by means of a false or fraudulent invoice or document with the intent to defraud the United States and contrary to law. *See* 18 U.S.C. §§ 542, 545.

Agent Albrecht was also familiar with the industry-wide manner of processing XLR11 into a smokable retail product.  He testified that after importing the XLR11, the designer drug manufacturers would dilute the XLR11 in acetone and mix it with an organic carrier, most often herbs or plant leaves, to make a final smokable product, which was then falsely marketed as herbal incense, potpourri, or "spice."  The final product would routinely be labeled "not for human consumption" in an effort to circumvent federal Food and Drug Administration ("FDA") regulations and evade law enforcement.  Lay witnesses testified that they had purchased the products to smoke and attested to their personal experiences with XLR11's harmful effects.[8]

Consistent with this industry model, the evidence at trial showed that ZenBio obtained XLR11 from China by importing it with false labels to avoid detection and seizure at the port of entry, and then manufactured smokable products by mixing the XLR11 with acetone and botanicals (organic material consisting of ground or shredded leaves of certain exotic plants, which are lawful

---

[8] Although not a chemist, Agent Albrecht testified on cross examination that he understood XLR11 was in fact not substantially similar to marijuana chemically but that it was similar to other drugs.  He was not asked to name what other drugs it was similar to.  Other lay witnesses discussed the effects of XLR11 and stated that it caused severe paranoia, among other adverse effects.

to possess, import, and sell).[9]  The designer drugs were then packaged for resale in Ziploc plastic baggies, disguised as herbal incense or potpourri, and shipped to convenience stores and smokeshops throughout the United States for retail sale.[10] ZenBio's product labels included ZenBio's name and logo, the brand name of the product, and a caution, "not for human consumption."  The labeling listed the botanical material and also sometimes listed chemicals that were *not* in the packet, but *none* of the labels listed XLR11 or indicated that the packet contained a smokable product.  Witnesses at trial testified that despite the label, the product was understood to be smokable and in fact was purchased for smoking, not as incense or potpourri.

Prior to November 2012, ZenBio was known as Zencense Incense Works ("Zencense").  Zencense was based in Pensacola, Florida, and owned by Burton Ritchie.  Zencense manufactured and distributed smokable synthetic cannabinoid products using XLR11 under the brand names Avalanche, Bizarro, Neutronium, Orgazmo, Posh, Shock Wave, and Sonic Zero.  Crystal Henry was in charge of

---

[9] ZenBio also followed the standard industry-wide manufacturing process of making a solution of XLR11 (a sandy, crystalline powder) and acetone.  The solution was introduced to a botanical "carrier" by spraying the botanical with the solution and mixing them together.  The treated botanicals were then spread out on drying tables for 12 to 24 hours before a flavoring was added.

[10] ZenBio products were found in smokeshops in Missouri, Tennessee, Illinois, Minnesota, and Maryland.  Special Agent Craig Underwood calculated that if an ordinary bag of potpourri were offered for sale at the prices being charged for ZenBio products, it would cost around $700.

accounting for Zensence; Robert Biggerstaff was responsible for sales and production management; and Jason Way was described as the ultimate decision maker for the business.  Ben Galecki initially coordinated Zensence's supply of XLR11, which he ordered through a middleman, either Jason Fox[11] or Adam Libby.[12]  Gross supplied Zencense with botanicals through his company, Sanctuary Traders.

In August 2012, Anthony Nottoli, a smokeshop entrepreneur from California who was interested in purchasing Zencense, met with Ritchie, Henry, and Gross in Pensacola.  Ritchie introduced Gross to Nottoli as Zencense's botanical supplier.  By mid-November 2012, Nottoli had purchased Zencense and changed the company name to ZenBio, LLC, but he retained Zencense's key employees.  ZenBio continued to manufacture the same product line as Zencense but moved the raw-materials storage and bulk manufacturing operations to a warehouse in Millbrae, California, where Tim Ortiz became head of production.  ZenBio's administrative functions remained in Pensacola until December 2012, when

---

[11] Fox was a smokeshop owner in Arizona who was trying to start an XLR11 importing business when he began filling Galecki's XLR11 orders from China.  Fox's first contact with the Zencense/ZenBio operation was meeting Galecki at a trade show in August 2012.

[12] Libby was a chemist and chemical supplier from Virginia.  His company, AI Biotech, provided ZenBio purity reports regarding its product. There were two types of reports:  one listing the chemicals or substances that the product sample did not contain, which was produced to smokeshop owners, and another listing what the sample did contain, including XLR11, which was provided to ZenBio but not its customers.

XLR11 was named as a scheduled controlled substance under Florida law (codified at Fla. Stat. § 893.03(1)(c)(152)), at which point ZenBio immediately left Florida and moved its administrative office to Robertsdale, Alabama.

When the administrative operations moved to Alabama in December 2012, Gross took over responsibility for obtaining and maintaining an adequate supply of XLR11 for ZenBio, and the record shows that he also purchased plastic Ziploc baggies from a company in China that were used to package ZenBio's products. Nottoli testified at trial that he was told that the chemicals were coming directly from China. According to Nottoli, Gross was paid two percent of ZenBio's profits, in addition to being reimbursed for the botanicals he supplied through Sanctuary Traders.[13] Henry testified consistent with Nottoli that Gross was paid two percent for his work of "finding the materials and management." (Doc. 125, at 119–20). Similarly, Biggerstaff, head of sales, testified that although Gross never visited the Alabama office, he continued to order the necessary supply of XLR11 after the office moved to Alabama. He described Gross as "head of procurement" and knew him as the man who "we were buying the botanicals from to actually make the product, and that he was in charge [of] getting and securing the active ingredient for us as well." (Doc. 124, at 88–89). Biggerstaff had seen the packages that the

---

[13] Nottoli characterized this two-percent stake as an "ownership interest."

chemicals arrived in and knew the writing to be Chinese or oriental, so he assumed they were coming from China.

Fox, a middleman supplier, also testified that Gross was responsible for ordering all of ZenBio's chemicals.  He said Gross told him that he had taken over the job from Galecki.  Although Gross and Fox never met in person, they talked, emailed, and texted frequently.  Fox said he and Gross used several "throwaway" telephones to avoid law enforcement monitoring, and Fox said Gross would use the name "Arturo" in emails using his ZenBio email address, zenbiotravis@gmail.  Fox testified that Gross would instruct him as to the quantity of XLR needed and would provide the addresses for shipping the goods, which consisted of several post office boxes, UPS or Copy/Com store accounts in New York, usually listed under the name Adam Libby, who was another supplier for Gross, but never in Gross's name.[14]  Fox testified that Gross asked how fast he could get the product and, based on the quantity Gross was ordering (50–100 kilograms of XLR11 weekly), Fox advised him to arrange for several different mail or UPS boxes to receive the shipments.  Fox explained at trial that it was necessary to break the large orders into smaller 2-kilogram packages to avoid customs scrutiny and minimize the impact of any seizure on ZenBio's chemical supply, even though this

---

[14] Fox explained that New York was preferred as a port of entry over Los Angeles because New York had a higher volume of import traffic, which made it more likely that the XLR11 shipments would be overlooked by customs enforcement.

resulted in higher shipping costs. Fox said Gross was aware of this and said he would email or text Gross the tracking numbers corresponding to each shipped package. Fox also explained that, although he and Gross did not directly discuss the reason for this strategy, it was understood that this was the way it needed to work in this industry to ensure an uninterrupted supply of XLR11 and avoid customs seizures, which would result if the boxes were identified as XLR11. Fox said that Libby handled the product after it arrived in New York but that he (Fox) was responsible for replacing any product that was seized before delivery. Fox's payment would be wired to his company, "Hostile Investing," and Fox, in turn, would forward payment to China before the XLR11 would ship.[15]

Henry testified that Gross would instruct her to wire payment for "chemicals" to Hostile Investing and other suppliers, including Elite Distributing and James Hertel. Henry testified that multiple emails she received from Gross instructing her to wire payments to these suppliers were in fact payments for "chemicals." Also in evidence were bank records showing subsequent wires from Hostile Investment and Hertel directly to China. In a December 2012 email from Gross to Henry, he asked her to check on a wire and expressed concern because the money had not yet been received in China, although it was unclear from the email

---

[15] Fox had his own middleman or "partner" who interacted directly with the Chinese suppliers.

11

whether he was referencing a chemical payment or payment for plastic baggies.[16]

Henry also confirmed that Gross used several different untraceable cell phones

when ordering chemicals for ZenBio and contacting her.

Fox testified to once receiving an email inquiry from Gross about a package

from China (which he assumed was from a different supplier) that was detained by

customs at the port in New York.  According to Fox, customs was asking Gross

about the product, and Gross did not know what to tell them that the chemical

would be used for.  Fox said he understood that Gross needed to know what to say

"to get it through customs," and Fox responded "delicately," giving Gross some

general information about fragrances used in detergents and soaps that he quickly

found on the internet and that Gross could offer as an explanation.  Fox said that,

to avoid detection, he never mentioned XLR11 directly in an email or text to

Gross, and he did not know what exactly was written on the import labels;

however, he acknowledged that the labels "certainly didn't say [XLR11]."

According to Fox, it was not necessary to instruct anyone to mislabel XLR11 on

import packages because, "[i]n the industry, you just knew that it was coming in

---

[16] Henry testified that Gross sometimes gave her invoices and receipts for payments related to botanicals supplied by Sanctuary Traders and for plastic baggie purchases, which he ordered from China.  However, she said there were never invoices for the chemical purchases. The record reflects that Gross sent emails to Alice Yip at Caiyuntian Plastic Package, Co. in China, regarding orders of plastic baggies, but the record additionally reflects that Yip's company also sold chemicals, and there was evidence linking chemical shipments from Yip's company to Elite Distributing, which was one of Gross's suppliers.

under a different [name] –you didn't need to tell anybody.  The only way it was getting into the country is by it coming in under whatever they want to put on it.  It could be shoe shine."

Gross used other XLR11 suppliers as well, including Adam Libby and Kevin Clancy.  Libby's name was on some of the post office and UPS boxes in New York that Gross directed Fox to send XLR11 shipments to.  Clancy received shipments in New York under the name James Hertel and also received wire payments from Gross through a bank account in Hertel's name, which Gross directed Henry to wire payments to for chemicals.[17]  Henry testified, and emails confirmed, that Gross also used a chemical supplier in Nevada called Elite Distributing, which the evidence showed also imported chemicals from China.  Although Gross used third-party suppliers and nominees for the chemical shipments from China, he himself purchased Ziploc baggies from China and had them shipped directly to the California facility in his own name.

---

[17] Hertel testified that Clancy gave him money to open the account.  Hertel knew money was being wired to the account but did not know Henry or ZenBio.  He said Clancy would give him the numbers he used to transfer the money elsewhere but he did not know where it was going.  Hertel said the money was Clancy's, and that in return, Clancy paid him for the use of his name.  Records showed that money was transferred from the account to China.  Special Agent Christopher Marshall, Department of Homeland Security, reviewed lists of products shipped in Hertel's name from China to New York (but not seized).  The lists included names of items that Marshall recognized as showing up repeatedly on shipments of powder contraband, such as "pearl powder" and "silicone dioxide."  Agent Marshall said items bearing similar suspicious but innocuous names had been seized in the past from Chinese companies and found to contain XLR11.

13

After import, the manufacturing and labeling of ZenBio's product for retail sales occurred at the Milbrae, California, warehouse. Gross visited the California production warehouse on only one or two occasions, based on testimony from Nottoli and Biggerstaff. Biggerstaff testified that on one occasion, "[w]e were both there at the same time just overseeing production to make sure that everything was getting done like it was supposed to be." He and Gross walked through the production warehouse together and observed workers weighing the product and packaging it into ZenBio's black foil bags, each marked with a label containing the name of the retail product. Biggerstaff said each bag also contained a label that said "not for human consumption," which he explained was intended to make it appear as though the product was not to be consumed orally, contrary to ZenBio's intent in manufacturing it. There was also evidence that two emails dated December 6, 2012, titled "ZenBio adjusted art" and containing a text stating that the attachments included images of "Modified label art," had been sent to Gross, Jason Way, and Crystal Henry for comment. The images were forwarded from the label company, and the attachments included proposed color photographs of labels, each clearly containing the ZenBio logo and the statement, "not for human consumption." Two of the labels also included a list of chemicals the product did not contain. A third email, dated January 15, 2013, sent to Gross and two others at

14

ZenBio merely referenced an attached list of revised product labels that was being ordered.

ZenBio's primary operating account was a Bank of America checking account opened on November 29, 2012.[18]  Henry testified that all of the company's sales profits were deposited into the Bank of America account.  Additionally, Henry paid Gross through Sanctuary Traders out of the Bank of America account and also wired payments to the chemical suppliers from that account, as directed by Gross.  However, Gross did not have signature authority on the Bank of America account.  For a time, ZenBio also had an account with Gulf Coast Community Bank in Florida on which Gross did have co-signing authority, but this account was closed when ZenBio moved to Alabama in December 2012, and there was no evidence that Gross ever used the account.

On February 11, 2013, Ortiz notified Nottoli of a ZenBio product seizure, stating that the company was facing "impending doom."[19]  Biggerstaff and Henry testified that they were also aware of the seizure, as well as others, because ZenBio had a policy of replacing the product the first time it was seized and thus, product

---

[18] ZenBio also had an account with Wells Fargo until the bank began to put holds on ZenBio's wire transfers.  In early February 2013, Henry sent an email to ZenBio members and employees (the list included Gross) stating that the Wells Fargo account was closed because the bank was not interested in doing business any longer with their "industry."  Gross did not have any signature authority on this account.

[19] The email is from "Michael Fitton," which Nottoli said was Ortiz's "pen name."  The message included a forwarded note from Jim Vail, Gross's co-defendant, stressing the importance of determining which law enforcement agency had intercepted the order.

15

seizures cost the company money. Product seizures also threatened the company's existence.

In early April 2013, Gross told Henry he was leaving the business. He placed Henry in charge of purchasing the chemicals and instructed Fox to contact her. The record reflects, however, that although Gross was no longer ordering the chemicals, he continued to advise Henry because she was unfamiliar with the ordering process. For instance, on one occasion, Henry asked Gross whether she should follow Fox's advice to arrange for a UPS postal address in Alabama to receive the imports in small packages and then send them on to California, repackaged. He advised her to follow that procedure, and she did. She also asked him to teach her about ordering the chemicals. Gross, however, would not do this over the telephone—Henry said Gross was very particular about what he discussed by telephone or text—so according to Henry, Gross agreed to meet her in the Atlanta airport to discuss the ordering process, which, again, was after he supposedly was no longer involved in the operation.[20]

On April 11, 2013, Adam Libby was arrested on federal charges. When Nottoli learned this, he and other ZenBio members decided to disband the company. At this time, five months into its existence, ZenBio had grossed over $29.5 million from its sales. Additionally, bank records showed that ZenBio had

---

[20] At the time, Henry lived in Pensacola, Florida, and Gross lived in Chicago.

transferred over $1.4 million to Gross through payments to his company, Sanctuary Traders.

Later in April 2013, Bruce Allen, a United States Postal Inspector in Daphne, Alabama, seized several UPS packages containing a large quantity of product that had been imported from China and shipped to Crystal Henry. The product had been separated for shipping into 47, 2-kilogram shipments. Each was tested and found to contain XLR 11, although XLR11 was not listed on any of the import labels. Also, between March and May 2013, Special Agent Marshall, then working for the Department of Homeland Security, purchased ZenBio products undercover to be tested. Marshall testified that he ordered several ZenBio products, including Bizarro, which came in black packages with a content label that included only the product name and the name of plant materials. Some labels also listed chemicals that the product did *not* contain, but none of the product labels referenced XLR11. All of the product, however, contained XLR11.

In July 2013, during the federal investigation of ZenBio, Special Agent Jason Gordon interviewed Gross. According to Gordon, Gross admitted selling botanicals to ZenBio and estimated that since November 2012, he had sold in the range of 36,000 pounds of botanicals to ZenBio at a price of $15 to $17 per pound. Gross also told Nottoli that he had a supplier for Ziploc baggies in China through which ZenBio purchased baggies for packaging its product. Gross admitted using

17

an email address of zenbiotravis@gmail for communicating with Nottoli about the supply of botanicals.[21]  Gross told Special Agent Gordon that he visited the Millbrae production facility once or twice, toured the production floor, and admitted he suspected they were making "spice."  Gross also admitted he had been an authorized signer on one ZenBio bank account.  He explained that Nottoli told him he would receive $12,000 a week for opening an account in his name as an employee of ZenBio, which he decided not to do, but he also said in vague terms that he had been employed to review "orders" for Nottoli, compare them with "invoices," and send out payments if they matched.  He did not tell Special Agent Gordon that he ordered chemicals for ZenBio or that he was paid a percentage of the company's profits.

The jury returned guilty verdicts against Gross on all counts.  After the close of the Government's evidence, the district court denied Gross's Rule 29 motion for judgment of acquittal.  Gross also moved for judgment of acquittal and a new trial after the verdict, renewing his arguments on the sufficiency of the evidence and challenging the district court's evidentiary rulings admitting Special Agent Albrecht's testimony about the industry, lay witness testimony about the effects of smoking ZenBio's products, and two incidents where agents had referenced

---

[21] According to Henry, Fox, and email exhibits, Gross also used the name Arturo Fuente in the zenbiotravis@gmail emails, although he did not use the name in person.

XLR11 as "a controlled substance analogue."[22]  By a written order, the district court denied the renewed motion for judgment of acquittal and the motion for a new trial.

At sentencing, the district court calculated Gross's offense level pursuant to the money laundering guideline, United States Sentencing Commission, *Guidelines Manual* ("USSG"), § 2S1.1(a)(2), which directed a base offense level of 8 plus the number of offense levels corresponding to the value of the laundered funds as shown in the table under USSG § 2B1.1(b)(1)(L).  Because the district court found that the value of the laundered funds was $23,566,000, 22 levels were added, for a Base Offense Level of 30.  To this, the district court added 1 level because Gross was found guilty of 18 U.S.C. § 1957, and an additional 3 levels for his supervisory role in the offense, for a Total Offense Level of 34.  *See* USSG §§ 2S1.1(b)(2)(A) (specific offense characteristics), 3B1.1(b) (aggravating role in the offense as manager or supervisor). Considering a Criminal History Category of I, Gross's guidelines range was 151–188 months.  The district court overruled Gross's objections to the guidelines calculation and, after considering the factors in 18 U.S.C. § 3553(a), sentenced him to 156 months of imprisonment, which was at

---

[22] A controlled substance analogue is a category of substances substantially similar to those listed as federal controlled substances that are to be treated as Schedule I controlled substances if intended for human consumption.  21 U.S.C. §§ 802(32)(A) & 813.  The analogue counts were dismissed prior to trial.

the lower end of the range. The district judge said that he would have imposed the same sentence regardless of the guidelines calculation, given the compelling evidence of Gross's guilt and the trial record showing the dangerous nature of XLR11, the "staggering" amount of money made by smuggling the drug from China, and the lay witness testimony regarding the dangerous effects of the drug when consumed.

## II.

Gross challenges the sufficiency of the evidence to support his convictions. "We review the sufficiency of the evidence to support a conviction *de novo*, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict." *United States v. Taylor*, 480 F.3d 1025, 1026 (11th Cir. 2007). In doing so, we consider whether there is evidence from which a reasonable trier of fact could find guilt beyond a reasonable doubt. *See United States v. Green*, 818 F.3d 1258, 1274 (11th Cir. 2016). A conviction may be based on direct or circumstantial evidence. *United States v. Martin,* 803 F.3d 581, 587 (11th Cir. 2015). Where credibility calls are at issue, this court "will not disturb the jury's verdict 'unless the testimony is incredible as a matter of law.'" *Green*, 818 F.3d at 1274 (quoting *United States v. Flores*, 572 F.3d 1254, 1263 (11th Cir. 2009)). Additionally, the evidence need not "exclude every reasonable hypothesis of innocence;" the "jury is free to choose

among reasonable constructions of the evidence." *United States v. Peters*, 403 F.3d 1263, 1268 (11th Cir. 2005) (quoting *United States v. Montes-Cardenas*, 746 F.2d 771, 778 (11th Cir. 1984)).

## A. Smuggling and Misbranding Conspiracy

The jury convicted Gross of a conspiracy to defraud the United States, on finding that the Government had proven two separate objects of the conspiracy, including smuggling XLR11 into the United States by means of a false statement contrary to law and in violation of 18 U.S.C. §§ 545, 542,[23] and (2) misbranding the XLR11 and causing it to be introduced into interstate commerce, in violation of 21 U.S.C. §§ 331(a), 333(a)(2),[24] all with intent to defraud the United States. *See* 18 U.S.C. § 371. To prove a conspiracy to defraud the United States under § 371, the government must prove: (1) "an agreement among two or more persons to achieve an unlawful objective;" (2) knowledge of and voluntary participation in the agreement; and (3) a conspirator's overt act in furtherance of that agreement. *See*

[23] Federal law prohibits knowingly smuggling goods into the United States that should have been invoiced or that passed through customs by a fraudulent invoice or other document or paper, with intent to defraud the United States, and prohibits "knowingly receiv[ing], conceal[ing], buy[ing], sell[ing], or in any manner facilitat[ing] the transportation, concealment, or sale of such merchandise after importation, knowing" it was clandestinely imported, contrary to law. 18 U.S.C. § 545. Section 542 provides that introducing goods or imported merchandise into the commerce of the United States by means of a false statement is a criminal offense. 18 U.S.C. § 542.

[24] The Federal Food Drug and Cosmetic Act prohibits "[t]he introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded." 21 U.S.C. § 331(a). Section 333 provides the criminal penalty for violating § 331 with intent to defraud or mislead. 21 U.S.C. § 333(a)(2).

21

*United States v. Hasson*, 333 F.3d 1264, 1270 (11th Cir. 2003).  The government need only prove that the defendant knew the essential nature of the conspiracy, not every detail.  *See United States v. Vernon*, 723 F.3d 1234, 1273 (11th Cir. 2013).  And knowledge of a conspiracy is sufficient "when the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can be fairly attributable to him."  *Id.* at 1273–74 (quoting *United States v. Molina*, 443 F.3d 824, 828 (11th Cir. 2006)).  Voluntary participation is shown by evidence of "surrounding circumstances such as acts committed by the defendant which furthered the purpose of the conspiracy." *Id.* (quoting *United States v. Parrado*, 911 F.2d 1567, 1570 (11th Cir. 1990)).  Finally, we have said that "[b]ecause conspiracies are secretive by nature, the existence of an agreement and [the defendant's] participation in the conspiracy may be proven entirely from circumstantial evidence." *United States v. Flanders*, 752 F.3d 1317, 1329 (11th Cir. 2014) (quoting *United States v. White*, 663 F.3d 1207, 1214 (11th Cir. 2011)), *cert. denied,* 135 S. Ct. 1188 (2015).

Gross argues the government failed to prove he had knowledge of the conspiracy by simply showing an industry practice or that others knew of the unlawful objective the conspiracy, citing *United States v. Kaplan*, 490 F.3d 110, 121 (2d Cir. 2007) (finding little relevance in proving that *others* in the office had knowledge of insurance fraud).  The court agrees that generally, evidence of the

knowledge of others, without more, is insufficient to demonstrate a defendant's knowledge of the unlawful object of a conspiracy. *See United States v. Willner*, 795 F.3d 1297, 1309–10 (11th Cir. 2015) (reversing a conspiracy conviction for lack of proof of knowledge). It is well settled, however, that a defendant's knowledge of an unlawful agreement and knowing participation can be proven by circumstantial evidence. *See, e.g., United States v. Pierre,* 825 F.3d 1183, 1193 (11th Cir. 2016); *Flanders*, 752 F.3d at 1329. On careful review of the record in this case, the court finds that Gross's own actions provide ample circumstantial evidence of his knowledge of the conspiracy and intent to join it. The record reflects that Gross not only attended the initial organizational meeting for ZenBio in November 2012, but also was one of three or four people who played a central role in the company from the outset, and he was solely responsible for ordering the XLR11. Gross spoke directly with the suppliers, always using one of multiple untraceable cell phones to place the XLR11 orders and to direct Henry to wire payments for XLR11 shipments. He also used a different name in emails and was careful to discuss XLR11 only as "units," without ever referencing its name in writing. Gross knew the product was being shipped in multiple containers; he instructed suppliers to send it to mailboxes in the name of others; and he knew the shipments were sent to a busy port of entry and were making their way to numerous post office and UPS boxes without seizure. These actions are

23

compellingly inconsistent with what would be expected of a person attempting to honestly obtain a legal product. Also, because Fox was responsible for replacing the chemical if seized at the port of entry and Gross did not get paid unless there was a profit from the final product, Fox and Gross both had a strong incentive to avoid detection and seizure of the XLR11 at the port of entry. The jury was also free to believe Fox's testimony that Gross once asked him what to say about the product's use in order to get a shipment through customs. Gross had ordered the product, so if he believed it was legitimate and properly labeled, he would not have needed to ask Fox for a plausible explanation regarding its use. *See Vernon*, 723 F.3d at 1273–74 (noting that "when the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious . . . knowledge of its character can fairly be attributed to him" (internal quotations omitted)). The jury could also infer knowledge from the fact that when questioned by law enforcement, Gross admitted he suspected ZenBio was producing spice, but he did not disclose his role of ordering the chemicals or his profits. He also falsely stated to an investigator that he used the zenbiotravis email only for the purpose of discussing botanicals with Nottoli, and he offered a false explanation as to how he earned $12,000 per week from ZenBio.

For those reasons, Gross's reliance on *Kaplan* and *Willner* is unavailing. In *Kaplan*, although the Second Circuit found that evidence of others' knowledge had

little relevance in proving the defendant's knowledge, the court also recognized that the knowledge of others would be "highly relevant" if supplemented by evidence that the information was communicated to the defendant or that "[the defendant] had been exposed to the same sources from which the[ ] others derived their knowledge."  490 F.3d at 121.  The court in *Kaplan* also found it significant that the insurance office where the fraud took place was not the type of office where the illegal nature of the business was necessarily visible to everyone who worked there.  *See id.*  Here, by contrast, the sole purpose of the business was to import XLR11 and sell XLR11 products before the law caught up with the scheme, and there was ample evidence that Gross was exposed to the same sources of information as others with knowledge because he was the one ordering chemicals for the business and communicating with the suppliers.

In *Willner*, we reversed a Medicare fraud conspiracy conviction against one defendant, Dr. Vanya Abreu, who was the Medicare compliance program director in a clinic where other doctors were engaged in Medicare fraud.  795 F.3d at 1305–10.  Despite her position in the clinic and some evidence at trial that Dr. Abreu should have known about the fraud based on what others were doing, we found no evidence, direct or circumstantial, sufficient to raise an inference that she actually knew of the fraud or that she knowingly joined in the conspiracy.  *See id.* at 1309–10.  We also noted that Dr. Abreu had not benefitted in any way from the fraud.

25

*See id.*  Here, the circumstantial evidence of Gross's knowledge is not based solely on his position in ZenBio or the knowledge of others, as Gross contends. Moreover, Gross personally profited enormously from the smuggling.  Thus, contrary to the evidence in *Willner*, the record of Gross's own actions, as outlined fully above, is sufficient for a reasonable jury to infer that he had knowledge of an agreement to engage in unlawful smuggling activity and that he knowingly joined that conspiracy.[25]

We also reject Gross's argument that because XLR11 was not a controlled substance at the time of his offense, the rule of lenity should apply.  Although we have previously applied the rule of lenity to a conviction under § 545, *see United States v. Izurieta*, 710 F.3d 1176, 1183–84 (11th Cir. 2013), the rule applied in that case only because the smuggling violation charged was contrary to a regulation that was ambiguous regarding criminal liability.  By contrast, Gross's conviction is based on a criminal statute that plainly prohibits smuggling by false labeling to

---

[25] Alternatively, although the jury was not instructed on deliberate ignorance, Gross could not insulate himself from criminal liability by having the boxes shipped to others and remaining deliberately ignorant of the falsity of the labels where he had every reason to know that the mislabeling and smuggling were necessary for XLR11 to arrive in the United States.  The evidence could have supported a verdict on this ground as well. This court has "consistently recognized deliberate ignorance of criminal activity as the equivalent of knowledge." *United States v. Alvarez-Coria*, 447 F.3d 1340, 1344 (11th Cir. 2006) (internal quotations omitted); *see also Willner*, 795 F.3d at 1315 (stating deliberate ignorance may establish knowledge of the unlawful purpose of the conspiracy); *United States v. Hristov*, 466 F.3d 949, 952 (11th Cir. 2006) (noting this court has "long recognized" that deliberate ignorance may be proof of knowledge).

26

avoid customs detection. *See* 18 U.S.C. § 542 ("Entry of goods by means of false statements"). Thus, the rule of lenity has no application here.

There was also evidence from which the jury could infer that Gross had knowledge of and willfully joined the conspiracy with regard to the second objective, i.e., to misbrand drugs sold in interstate commerce.[26] Federal law prohibits introducing any adulterated or misbranded drug into interstate commerce. *See* 21 U.S.C. §§ 331(a); 331(k). The evidence at trial established that ZenBio was mislabeling drugs and delivering them into interstate commerce purporting to be pot-pourri. Gross's knowledge and participation could be inferred from the fact that he was copied on emails containing product art labels that plainly show the product was labeled "not for human consumption," despite the company's clear intent to sell smokable designer drugs. Also, the labels emailed to Gross did not list XLR11 as an ingredient, and he knew that the product contained XLR11 (he maintained at trial that it was a legal product). It is immaterial that Gross did not respond to the emails. They were sent directly to his email address, he responded to other emails at that address, and thus he was exposed to the same source of information as others with knowledge. *See, e.g., Kaplan*, 490 F.3d at 121 (stating exposure to the same sources of knowledge as others is highly relevant).

---

[26] Although "the evidence need only be sufficient for any one of the charged objects to sustain a conviction," *United States v. Moran*, 778 F.3d 942, 963 (11th Cir.), *cert. denied sub nom. Huarte v. United States*, 136 S. Ct. 268 (2015), the jury found Gross guilty of both objects of the conspiracy.

Additionally, the inference is bolstered by Gross's visits to the California facility where the manufacturing and packaging occurred and his receipt of a cut of the profits from the misbranded products. And, because he was ordering the chemicals for the product, the jury could reasonably infer his knowledge that marketing the products as ordinary pot-pourri was false. In light of this evidence, it is immaterial to the conspiracy charge that Gross did not have direct involvement in the misbranding of the retail product.[27]

### B. Money Laundering and Money Laundering Conspiracy

The jury convicted Gross on three counts of substantive money laundering based on three wire transfers from ZenBio's Bank of America account on February 19, 2013, and March 4 and 19, 2013, in violation of 18 U.S.C. § 1957, and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). A conviction under § 1957 requires proof that the defendant knowingly engaged in a monetary transaction in "criminally derived property of a greater value than $10,000" that was "derived from specified unlawful activity." 18 U.S.C. § 1957(a); *see also United States v. Toll*, 804 F.3d 1344, 1358 (11th Cir. 2015). The statute defines a "monetary transaction" as including a deposit, withdrawal or transfer of funds. § 1957(f)(1). The term "criminally derived

---

[27] Again, alternatively, Gross cannot remain willfully blind to the purpose of the conspiracy where he had every reason to know of it. *See Willner*, 795 F.3d at 1315; *Hristov*, 466 F.3d at 952.

28

property" means "any property constituting, or derived from, proceeds obtained from a criminal offense. § 1957(f)(2). The term "proceeds" is defined broadly as including "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity." 18 U.S.C. § 1956(c)(9); *see also* § 1957(f)(3). Because "[m]oney laundering is an offense to be punished separately from the underlying criminal offense," it cannot occur until after "the predicate crime becomes a 'completed offense.'" *United States v. Nolan*, 223 F.3d 1311, 1315 (11th Cir. 2000) (quoting *United States v. Christo*, 129 F.3d 578, 579 (11th Cir. 1997)).

Regarding the substantive money laundering counts, Gross first argues there is insufficient evidence that he knew the funds were proceeds of criminal activity because he lacked knowledge of the underlying unlawful smuggling. This argument fails for the reasons recited above. We have already determined that there was sufficient evidence from which a jury could infer that Gross, who ordered the XLR11 from China through middlemen and received profits from the sales, knew of the smuggling and that it resulted in proceeds in ZenBio's account. Special Agent Underwood testified that all of the receipts from the retail sales of the XLR11 products were deposited into ZenBio's Bank of America account, and there is sufficient evidence that Gross directed Henry to wire the three payments (over $10,000 each) to Hertel's account from ZenBio's Bank of America account

29

for more chemicals.  Henry wired the money.  It is immaterial that Gross did not have signature authority on the account because his ability to direct Henry to make the payment shows he had control.  *See Nolan*, 223 F.3d at 1316 (defendant demonstrated control over an account as if it was his own).

Gross argues that there were no proceeds from the smuggling because the profits derived from the retail sale of ZenBio's products were too attenuated to be considered proceeds of smuggling XLR11, relying on *United States v. Khanani,* 502 F.3d 1281, 1296 (11th Cir. 2007).  We disagree.  In *Khanani*, we found that the connection between profits realized from the sale of jeans (goods sold) and the specified unlawful activity of employing undocumented aliens (labor), although causally plausible, was too indirect to be considered proceeds derived from the unlawful employment activity.  *Id.*  The facts of *Khanani* are distinguishable from this case where the proceeds were derived from the sale of a product that *included* the unlawfully smuggled XLR11 as the vital ingredient.  Moreover, after we decided *Khanani,* Congress amended the definition of proceeds to include any property obtained "directly or indirectly" from the unlawful activity.  18 U.S.C. § 1956(c)(9); *see also* 18 U.S.C. § 1957(f)(3).  Because the smuggled XLR11 was a necessary part of the goods sold and was the sole reason the product generated extraordinarily high profits, the proceeds at issue were obtained at a minimum indirectly, if not directly, from the unlawful smuggling activity.

We also reject Gross's argument that the three wire transfers providing the basis for the substantive money laundering counts, which occurred in February and March 2013, could not have included "proceeds" because the only XLR11 shipments in evidence were seized in April 2013, which was *after* the wire transfers. This argument lacks merit and deserves little discussion. For reasons already stated, a reasonable jury could find from the evidence at trial that *all* shipments of XLR11 to ZenBio, which Gross had been ordering from Fox since at least December 2012, originated from China, were labeled incorrectly in order to pass through customs, and produced the proceeds that were deposited into ZenBio's account.

Similarly unavailing is Gross's argument that the substantive money laundering transactions were nothing more than payment for XLR11, which was part of the underlying smuggling activity, citing *United States v. Harris*, 666 F.3d 905 (5th Cir. 2012). While *Harris* stands for the proposition that a mere payment in exchange for controlled substances cannot be considered money laundering, the payment in *Harris* did not involve proceeds because the drug transaction was not completed until after the money exchanged hands. Here, as we have already determined, the money previously deposited into ZenBio's Bank of America account and used in the wire transactions in February and March for the purpose of

31

purchasing more chemicals was proceeds from *prior* completed smuggling activity.

Gross relies for his merger argument on the concurrence in *United States v. Santos*, in which Justice Stevens stated that "[a]llowing the Government to treat the mere payment of the expense of operating an illegal gambling business as a separate offense is in practical effect tantamount to double jeopardy."  553 U.S. 507, 527, 128 S. Ct. 2020, 2033 (2008) (Stevens, J., concurring).  We have noted that the precedential value of *Santos*, where no rationale was supported by a majority of the Justices, is limited by the concurrence to cases in which the underlying criminal conduct is operating an unlicensed gambling business.  *See United States v. Demarest*, 570 F.3d 1232, 1242 (11th Cir. 2009).

Gross also quotes part of a sentence from our opinion in *United States v. Esquenazi*, 752 F.3d 912 (11th Cir.), *cert. denied*, 135 S. Ct. 293 (2014), for support.  The full quote from *Esquenazi* is:  "Conducting a criminal enterprise necessarily requires paying its essential expenses—doing so should not also be separately punishable as money-laundering, *at least when the rule of lenity comes into play*."  *Id.* at 935–36 (emphasis added).  But the rule of lenity is no longer in play.  After *Santos* applied the rule of lenity to interpret the ambiguous term "proceeds" in the money laundering statutes, 553 U.S. 507, 128 S. Ct. 2020, Congress amended the language of sections 1956 and 1957 by defining the term

"proceeds" to include gross receipts.  *See, e.g.*, *United States v. Abdulwahab*, 715 F.3d 521, 531 n.8 (4th Cir. 2013) ("After the Supreme Court decided *Santos*, Congress amended the money-laundering statute to specifically define 'proceeds' as 'any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity.'" (quoting Fraud Enforcement and Regulatory Act of 2009, Pub. L. No. 111–21, § 2(f)(1), 123 Stat. 1617, 1618 (codified at 18 U.S.C. § 1956(c)(9)))). *Esquenazi* and *Abdulwahab, supra*, on which Gross also relies, both addressed pre-amendment conduct.

Also, contrary to Gross's argument, the money laundering counts did not charge transactions that were merely payment for the essential expenses of the underlying conduct such that they were indistinct criminal offenses.  Instead, the money laundering counts charged transactions made using gross receipts of past, completed criminal conduct for the purpose of financing new criminal conduct. Even considering that the smuggling conspiracy was ongoing criminal activity, it is sufficient that a portion or phase of the scheme had been completed and had produced the proceeds used in the subsequent transaction.  *See United States v. Richards*, 234 F.3d 763, 770 (1st Cir. 2000) (finding that money laundering can occur with proceeds derived from "*a completed phase of an ongoing offense*") (quoting *United States v. Conley*, 37 F.3d 970, 980 (3rd Cir. 1994)).

33

The money laundering conspiracy conviction is also supported by the record. To prove a money laundering conspiracy, the government must establish "(1) an agreement between two or more persons to commit a money-laundering offense; and (2) knowing and voluntary participation in that agreement by the defendant." *United States v. Moran*, 778 F.3d 942, 962 (11th Cir.) (quoting *United States v. Broughton*, 689 F.3d 1260, 1280 (11th Cir. 2012)), *cert. denied*, 136 S. Ct. 268 (2015). Proof of a "formal agreement" is not required and instead, the government may demonstrate the existence of "a meeting of the minds to commit an unlawful act" by circumstantial evidence. *United States v. Arias–Izquierdo*, 449 F.3d 1168, 1182 (11th Cir. 2006); *see also Toll*, 804 F.3d at 1355 (noting circumstantial evidence can establish the existence of an agreement). Additionally, "conspirators are liable for *all of the acts and foreseeable consequences* of the conspiracy." *United States v. Silvestri*, 409 F.3d 1311, 1335 (11th Cir. 2005) (quoting *United States v. Alas*, 196 F.3d 1250, 1251 (11th Cir. 1999)). An agreement and Gross's willing participation can be reasonably inferred from his knowledge that the smuggling activity was generating large receipts on the retail end, his acceptance of profits of over $1 million, which were transferred from ZenBio's account and deposited into Gross's Sanctuary Traders account, and his repeated acts of directing Henry to make payments to Hertel and other suppliers out of ZenBio's account. *See United States v. Castronuovo*, 649 F. App'x 904 (11th Cir. 2016)

34

(finding an agreement to engage in "monetary transactions in criminally derived property valued greater than $10,000 by [defendants] accepting their paychecks with knowledge that the funds were derived from the clinics' unlawful activity") (unpublished), *cert denied*, 2016 WL 4272626 (Oct. 3, 2016).  Also, it was reasonably foreseeable that all of ZenBio's profits would be deposited into its bank account. Thus, there was sufficient evidence from which a jury could find that Gross participated in a money laundering conspiracy.

## III.

Gross also argues he is entitled to a new trial based on certain evidentiary rulings and references in the record to XLR11 having been an analogue drug at the time of the investigations.  He contends this was highly prejudicial because the analogue counts were dismissed prior to trial.  Specifically, Gross objected to Special Agent Albrecht's testimony about synthetic drugs in general as lacking a scientific foundation; the testimony of laypersons on the physical effects of XLR11 and ZenBio's products in particular also as lacking a scientific foundation; and two statements by government witnesses to the effect that XLR11 was a controlled substance analogue.[28]  We review for an abuse of discretion the district court's

---

[28] During the Government's examination of Special Agent Gordon, he answered one question with the unsolicited statement that XLR11 was a controlled substance analogue. Defense counsel declined the judge's offer to give a cautionary instruction to the jury, finding it best not to emphasize the matter.  Also, in response to a question by defense counsel as to whether XLR11 was a controlled substance at the time, Special Agent Randy Hoffman stated that XLR11 was listed as a controlled substance analogue.  Hoffman also acknowledged in his

ruling on a motion for new trial, as well as its evidentiary rulings. *See Toll,* 804 F.3d at 1353 (scope of lay testimony); *United States v. Sweat*, 555 F.3d 1364, 1367 (11th Cir. 2009) (motion for new trial); *United States v. Edouard*, 485 F.3d 1324, 1343 (11th Cir. 2007) (evidentiary rulings). Even if an abuse of discretion is shown, we will not reverse for a non-constitutional evidentiary error "absent a reasonable likelihood that the defendant's substantial rights were affected." *United States v. Malol*, 476 F.3d 1283, 1291 (11th Cir. 2007) (quoting *United States v. Sellers*, 906 F.2d 597, 601 (11th Cir. 1990)).

Having carefully reviewed the record, we find no error that affected Gross's substantial rights. Even though Gross was not tried on the substantive analogue counts, the testimony of Special Agent Albrecht regarding the synthetic drug industry practices and testimony of lay witnesses regarding why the product was purchased and how it affected them was intrinsic to the crime charged. Additionally, the testimony was grounded in personal experiences and was not offered as scientific evidence. Finally, we agree with the district court that the two statements by agents that XLR11 was an analogue were harmless. Although the analogue counts had been dismissed, we agree that the jury was not likely to have understood the meaning of the term. Also, defense counsel declined a curative

---

testimony, however, as had other witnesses, that XLR11 was not a controlled substance and that if someone possessed XLR11 during the month prior to May 16, 2013, they had one month to dispose of it.

instruction.  On this record, we find no reasonable probability that "but for the offending remarks, the defendant would not have been convicted." *United States v. Snyder*, 291 F.3d 1291, 1294 (11th Cir. 2002) (quoting *United States v. Calderon*, 127 F.3d 1314, 1335 (11th Cir. 1997)).  Because Gross's substantial rights were not affected, *see Malol*, 476 F.3d at 1291, we find no error or abuse of discretion in the district court's evidentiary rulings, much less reversible error.

## IV.

Finally, Gross challenges his sentence on several grounds.  We review a district court's sentencing decision for procedural and substantive reasonableness applying an abuse of discretion standard.  *See Gall v. United States*, 552 U.S. 38, 51, 128 S. Ct. 586, 597 (2007); *United States v. Barrington*, 648 F.3d 1178, 1194 (11th Cir. 2011), *cert. denied,* 132 S. Ct. 1066 (2012).  An abuse of discretion occurs if the district court "applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous." *Barrington*, 648 F.3d at 1194 (quoting *United States v. Ellisor*, 522 F.3d 1255, 1273 n.25 (11th Cir. 2008)). We therefore review the district court's fact findings for clear error, and we apply *de novo* review to its interpretation and application of the United States Sentencing Guidelines. *See id.* at 1194–95, 1197.

We first consider whether the district court committed procedural error.  A "significant procedural error" occurs at sentencing when the district court fails to

37

properly calculate the guidelines range, treats the guidelines as mandatory, fails to consider the sentencing factors of 18 U.S.C. § 3553(a), or selects a sentence based on clearly erroneous facts. *Gall*, 552 U.S. at 51, 128 S. Ct. at 597; *see also Barrington*, 648 F.3d at 1194. If the sentence is procedurally sound, we then consider its substantive reasonableness, taking into account the totality of the circumstances, being mindful that "[t]he sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case." *Gall*, 552 U.S. at 51, 128 S. Ct. at 597 (internal quotations omitted). Also, an error in calculating a guidelines sentencing range may be harmless if the district court stated on the record that it would have imposed the same sentence regardless of any error in the calculation, and if we determine that the sentence is reasonable even if the guidelines issue had been determined in the defendant's favor. *See United States v. Keene*, 470 F.3d 1347, 1349 (11th Cir. 2006).

Gross argues that the district court miscalculated his sentencing range by selecting a base offense level according to the value of the laundered funds under USSG § 2S.1.1(a)(2) instead of under the guideline applicable to the underlying offense from which the proceeds were derived, i.e., smuggling, pursuant to USSG § 2S1.1(a)(1). We find no procedural error. Guideline § 2S1.1(a)(1) directs the district court to apply the offense level for the underlying offense if it can be determined. The underlying offense in this case is smuggling, §§ 545, 542.

Guideline § 2T3.1, which is applicable to Custom Taxes and deals with some violations of § 545. The Introductory Commentary to USSG § 2T3.1 states that the guideline applies even when some types of contraband are involved, such as uncertified diamonds, but provides further that it "is not intended to deal with the importation of other types of contraband, such as drugs . . . the importation of which is prohibited or restricted for non-economic reasons." USSG Ch. 2, Pt.T.3, intro. comment. This case involves drugs that were illegal in some states at the time of the smuggling activity and thus could be categorized as contraband, making USSG § 2T3.1 inapplicable. As a result, the district court was required to use the next analogous guideline, but Part 2D was inapplicable because the drugs were not listed as controlled substances at the time of the offense, and there was no proof that they were analogue drugs at the time. Thus, the district court correctly applied the money laundering guideline, USSG § 2S1.1(a)(2).

Gross argues alternatively that the district court erred in determining the monetary value of the laundered funds, but we find no clear error in the district court's determination of value. The government presented evidence that the total amount laundered through ZenBio's bank account by checks and transfers amounted to $23,566,000. Gross's lack of signature authority on the Bank of America account is immaterial because, as already discussed, Gross demonstrated he had the authority to direct payments from the account, his Sanctuary Traders

39

account received substantial proceeds, and the number and size of the transactions were reasonably foreseeable to Gross because making a quick profit was the purpose of the scheme.  Gross also argues that because the government stipulated to a money judgment of $300,000 to settle the forfeiture count, the value of the money laundering conspiracy at sentencing was limited to that amount.  We disagree.  It is clear from the record that the government had already seized over $600,000 from Gross through Sanctuary Traders and agreed to settle the forfeiture issue for an additional $300,000 to avoid having to try the forfeiture count to the jury.  This did not resolve Gross's criminal liability for purposes of calculating his sentencing guidelines range.

Gross also challenges the three-level enhancement under USSG § 3B1.1(b) for his role in the offense as a "manager or supervisor," arguing that he was not a leader with respect to any money laundering activity.  *See United States v. Salgado*, 745 F.3d 1135, 1140 (11th Cir. 2014) (stating "relevant conduct for Chapter Three adjustments is limited to [the defendant's] part in the money laundering offense"). Because the determination of a defendant's role in an offense is a finding of fact, we review the decision for clear error.  *United States v. Rodriguez De Varon*, 175 F.3d 930, 937 (11th Cir. 1999) (*en banc*).  We note that in making this fact-intensive determination, the district court has "considerable discretion."  *United States v. Boyd*, 291 F.3d 1274, 1277–78 (11th Cir. 2002).  The

40

district court's finding that Gross was a supervisor on this record where he had either an ownership or manager interest, accepted large profits, and directed Henry to make wire payments with proceeds is not clear error.

Moreover, the sentence, which is at the low end of the guidelines range, is not substantively unreasonable. "Although we do not automatically presume a sentence within the guidelines range is reasonable, we ordinarily expect a sentence within the [g]uidelines range to be reasonable." *United States v. Hunt*, 526 F.3d 739, 746 (11th Cir. 2008) (alteration and internal quotation marks omitted). In this case, the district court properly considered the record and the 18 U.S.C. § 3553(a) factors. Although in imposing sentence the district court relied in part on the dangerous nature of XLR11, despite the fact that there was no proof that it was an analogue drug at the time, the district court's concerns were supported by the record. Also, "[t]he weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court." *See United States v. Clay*, 483 F.3d 739, 743 (11th Cir. 2007) (internal quotation marks omitted). We find no abuse of discretion.

V.

For the reasons stated above, Gross's convictions and sentence are **AFFIRMED.**

41