[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

Nos. 15-13997, 16-17781, 17-12057
Non-Argument Calendar

_____

D.C. Docket No. 6:14-cr-00043-CEM-DCI-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DONOVAN G. DAVIS, JR.,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(March 27, 2019)

Before WILLIAM PRYOR, ROSENBAUM, and ANDERSON, Circuit Judges.

PER CURIAM:

Donovan G. Davis, Jr., is currently serving a 204-month total sentence of imprisonment after a jury convicted him on charges of mail fraud, wire fraud, money laundering, and conspiracy to commit mail fraud and wire fraud.  On appeal, Davis challenges multiple aspects of the district-court proceedings.  He argues that (1) insufficient evidence supports his fraud convictions; (2) the government presented false testimony to secure his convictions; (3) the district court erred in admitting a coconspirator's plea agreement that referenced a polygraph examination; (4) the court wrongly limited evidence of another coconspirator's prior fraudulent conduct; (5) the court abused its discretion in instructing the jury; (6) the court erred in estimating the amount of loss attributable to him under the Sentencing Guidelines; (7) the court improperly denied his motion for a new trial under Rule 33(b), Fed. R. Crim. P., without a hearing; and (8) the court erred in denying his *pro se* motions for permission to file a second Rule 33 motion, for the district court judge's recusal, and for a hearing under *Faretta v. California*, 422 U.S. 806 (1975).  After careful review, we reject all of these arguments and affirm Davis's convictions and sentence.

## I.

The government charged that Davis, Blayne Davis ("Blayne," no relation to the defendant), and Damien Bromfield ("Bromfield") perpetrated a scheme to defraud through Capital Blu Management, LLC ("Capital Blu"), a company that traded in the off-exchange foreign currency, or "forex," marketplace.  From January

2

to August of 2008, according to the indictment[1], Davis, Blayne, and Bromfield (collectively, the "partners") solicited and retained investors by making false representations about Capital Blu's trading performance, the risks associated with its trading practices, and the value of investments. All the while, the indictment alleged, the Capital Blu partners diverted investor money to inure to their personal benefit and to sustain the fraud.

A jury trial was held over nine days in early May 2015. The government presented its case through contemporaneous emails from coconspirators, testimony from participants Bromfield and Beth Courtney, who was Capital Blu's accountant, and testimony from numerous investor-victims. The government also presented the testimony of a forensic accountant, Crystal Boodoo, who analyzed Capital Blu's trading activities and accounts from September 2007 to September 2008.

The government's evidence, viewed in the light most favorable to the verdict, established the following. Coconspirators Bromfield and Blayne formed Capital Blu in January 2007. Davis joined as a managing partner in August 2007. Davis, who had no prior trading experience, was recruited by Bromfield for his "large network

---

[1] A federal grand jury returned a 27-count indictment against Davis and Blayne in February 2014. Davis was charged with one count of conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. §§ 1341, 1343, and 1349; five counts of mail fraud, in violation of § 1341; twelve counts of wire fraud, in violation of § 1343; and nine counts of money laundering, in violation of 18 U.S.C. § 1957. Blayne was charged with a subset of these offenses, while Bromfield was charged in a separate indictment. Davis pled not guilty and went to trial. Blayne and Bromfield pled guilty and agreed to cooperate with the government.

of high net worth individuals," due to his family's business connections.  As a partner, Davis was responsible primarily for bringing in investors.  Blayne did the trading.  Bromfield ran business operations.

In September 2007, shortly after Davis joined Capital Blu, the company set up a forex[2] investment fund—the CBM FX Fund, LP—which pooled investor money to be traded by Capital Blu as one large account on the forex market.  Capital Blu's income was based on management fees and a percentage of trading profits, as set forth in written agreements with investors.

By late 2007, the three partners believed things were going well for Capital Blu.  They began paying themselves a monthly salary of $15,000 each.  They also purchased an interest in a private jet.

On January 22, 2008, however, Capital Blu sustained heavy trading losses.  Courtney testified that she prepared a report for the partners on the extent of the loss.  The report showed a loss of $2.8 million, or 31%, leaving Capital Blu with a purported $9 million under management.  In fact, the amount of money under management was closer to $5 million.  Courtney's $9 million figure included approximately $4 million in a "Saxo Bank" account that, several months later, was found to have been fabricated by Blayne.

---

[2] "Forex" is a term commonly used to refer to the foreign exchange market, where currencies are traded.  *See* https://www.investopedia.com/terms/f/forex.asp (last visited Feb. 12, 2019).

Capital Blu had not regained its losses by February 1, 2008, when it had to report its monthly performance to investors. The partners worried that reporting the losses to investors would cause them to pull their money, and Davis was concerned about his reputation in the community. To buy more time, the partners decided not to disclose the loss and, instead, to report a small gain to the investors. After a discussion, they settled on a gain of around 1.5%. Accordingly, Capital Blu sent out account statements to investors, via mail and email, falsely reporting a 1.6% gain during January 2008.

Emails from February 2008 show that the partners knew that the clients' account statements overstated the amount of money actually in Capital Blu's brokerage accounts. In a February 8 email to Davis and Blayne, Bromfield pegged the difference between the "current client obligation" reflected on the account statements and the "current brokerage valuation"—a difference he referred to as the "gap"—at $3.2 million, or 29%. Bromfield gave out assignments to close the gap: Blayne was to "trade like hell"; Bromfield was to cut costs; and Davis was to "keep trying to raise money as fast as you can."

Davis successfully solicited new investments. Despite knowing that Capital Blu had just suffered heavy trading losses during January 2008, Davis told investors that Capital Blu had never sustained a loss, using marketing documents showing consistent gains every month, including January 2008. He also told investors that

5

the vast majority of their investment—from 80 to 90%—was protected by a "stop loss," even though he knew that the protection either did not exist or was ineffective, given that Capital Blu had just sustained losses of more than 30%.

Meanwhile, despite the partners' plan to close the gap by maximizing the amount of money under management, they nevertheless withdrew investor money for improper purposes. Courtney testified that, as of February 2008, Capital Blu's operating expenses were exceeding the legitimate revenue that it was entitled to under the investor agreements. Rather than cut partner salaries or sell the private jet, Capital Blu took the difference directly out of investor money. Davis or Bromfield authorized the transfers, according to Courtney. Courtney also testified that the partners used client money to cover personal expenses like a chartered jet used for personal travel, luxury car payments, and trips to Jamaica. For example, Davis spent most of a month in Jamaica for forex "seminars," and he requested a round number for reimbursement and presented no receipts to document his expenses.

By March 1, 2008, when Capital Blu had to report its monthly performance to investors, Capital Blu had not recovered its January losses. The gap remained at around 30%, according to a report Courtney prepared for the partners. Nonetheless, the partners decided to falsely report a gain of 3.32% for February trading.

A few days later, Courtney told Bromfield that she was uncomfortable "lying to investors." She then expressed similar concerns to Davis, who did not dispute

that there was a gap in funding or that the company was lying to its investors. Courtney resigned later that month and reported Capital Blu to law enforcement.

Little changed after Courtney's exit from Capital Blu. Each month from April through September 2008, when Capital Blu was shut down, the partners continued to report false numbers to investors reflecting steady profits from trading. Emails between the partners in April, June, and July of 2008 show that the partners also continued to draw from their brokerage accounts to pay for things like partner salaries, credit card payments, and the private jet. And Davis continued to solicit new investments and assure current investors with the same falsehoods he had used before. He told investors that a certain percentage of their investments was protected against loss and that Capital Blu was profitable and had never sustained a loss.

But Capital Blu was never profitable after January 2008, and the partners knew as much. An April 22, 2008 email from Bromfield to the other partners showed that the gap—the difference between the amount showing on client statements ($10.9 million) and the amount actually in the accounts ($7.4 million)— remained near 30% ($3.5 million). In the following months, emails between the partners discussed both pulling investor money from Capital Blu's brokerage accounts and "re-appropriat[ing]" new investments in order to cover operating expenses. The partners also discussed making up a reason to institute a six-month lock-up of client funds, so as to prevent any investor withdrawals.

On August 8, 2008, Capital Blu sustained massive trading losses of approximately $4 million. That same day, Davis and Bromfield discussed freezing some client funds. Around the same time, Bromfield learned that Blayne had been secretly diverting funds from Capital Blu to another company, Nakano Capital. He also learned that the Saxo Bank account did not exist. Bromfield notified Davis, and they terminated Blayne as a partner at the end of August 2008.

Capital Blu never mentioned the extensive August losses to investors, however. Instead, Davis and Bromfield continued to report that Capital Blu was profitable. They posted a gain of 0.16% to investors for the month of August. Around the same time, they posted a letter to clients on their website instituting a four-month lock-up of client funds.

Nor did the massive trading losses in early August stop Davis from soliciting new investments with the same falsehoods. For example, one investor decided to invest $100,000 in late August after Davis assured him that Capital Blu was doing well and was always turning profits. Several weeks later, in September 2008, the National Futures Association, an industry regulator, shut down the company after Capital Blu refused to cooperate with an audit.

According to Crystal Boodoo, a forensic accountant and auditor with the U.S. Attorney's Office, total contributions were $16.9 million. The bulk of that money—$7 million or 41.47%—was lost on the market from September 2007 until September

8

2008. Another $4.7 million, or 28%, went to payments to Capital Blu and its partners. Of that $4.7 million, Davis took $607,996, Bromfield took $332,916, and Blayne took $400,073. Capital Blu spent another $1 million on payments for cars and private planes and spent $2.4 million on various other expenses. Investors reclaimed $3.87 million.

Contrary to the investor account statements, according to Boodoo, Capital Blu was never profitable. Cumulative losses as of March 2008 were approaching $5 million. While Capital Blu rebounded over the coming months, it never approached profitability. At its highest point since December 2007, it reached cumulative losses of approximately $2 million in July 2008. But the next month saw trading losses of approximately $4 million, followed by additional losses in September, resulting in cumulative losses of approximately $7 million. Boodoo also testified that, in her analysis, Capital Blu misrepresented its actual rate of return every month from September 2007 until September 2008.

## II.

Based on this evidence, the district court denied Davis's motions for judgment of acquittal, and the jury found Davis guilty of one count of conspiracy to commit mail and wire fraud, six counts of wire fraud, one count of mail fraud, and eight counts of money laundering. The jury failed to reach a verdict on two counts of mail fraud, one count of wire fraud, and one count of money laundering, and the court

9

declared a mistrial as to those counts. The remaining counts of the 27-count indictment had been dismissed before trial. After trial, the counts on which the jury was deadlocked were dismissed with prejudice.[3]

Using the 2013 Guidelines Manual, the presentence investigation report ("PSR") recommended holding Davis responsible for investor losses totaling $10,520,005. Davis filed objections, arguing that the loss amount should be based on the actual gain to him, which was $607,996. In his view, losses beyond that amount were not reasonably foreseeable because he believed that investors would eventually be made whole. Alternatively, he asserted that the loss amount "should only consist of investments that were made on or after April of 2008," since the jury had acquitted him of the substantive counts based on conduct before April.

The government responded in support of the PSR's loss calculation. It argued that the $10.5 million figure properly included loss from Davis's pre-January 2008 falsehoods as well as losses from the conspiracy, which included amounts under management as of January 31, 2008, and any net investment thereafter. The figure excluded the account balance at the end of the conspiracy. The government prepared and submitted a summary exhibit reflecting these calculations.

---

[3] To be more precise about it, Counts 4, 6, 7–9, 22, and 24 were dismissed on government motion before trial. The jury returned a guilty verdict on Counts 1, 5, 11–18, 20–21, 23, and 25–27. The jury was hung on Counts 2, 3, 10, and 19, which were dismissed with prejudice on government motion on May 21, 2015. All count numbers above are based on the original indictment, which was amended and renumbered before trial.

Thereafter, Davis filed an amended sentencing memorandum urging a loss amount of $4.7 million, which was the amount that the partners diverted for their personal benefit. He also asserted that he should not be held liable for any losses before January 2008.

At sentencing in August 2015, the district court determined that Davis was responsible for a loss of more than $10 million to investors, despite his arguments for a lesser amount. The court adopted the PSR's loss figure without further elaboration. That figure resulted, after additional guideline calculations not relevant to this appeal, in a total offense level of 36. With a criminal history category of I, Davis's guideline range was 188 to 235 months of imprisonment. After hearing from the parties and considering the 18 U.S.C. § 3553(a) sentencing factors, the district court sentenced Davis to a total of 204 months in prison.

Some time later, in March 2016, Davis filed a *pro se* motion for a new trial based on newly discovered evidence under Rule 33(b), Fed. R. Crim. P., which had been prepared by a prisoner named Frank Amodeo. Davis claimed that, after the trial, three people came forward with facts supporting his innocence. He attached affidavits from three federal prisoners who claimed to have heard Bromfield, after the trial, state that he lied in his testimony at Davis's trial to get a more lenient sentence from the government. The district court struck the motion because Davis was represented by counsel.

11

A few months later, Davis filed a similar motion through counsel, relying on the same three affidavits plus one additional affidavit. Each of the affiants stated that they overheard Bromfield in some manner or form admit that he falsely testified in Davis's trial. In addition to these affidavits, Davis attached to the motion memoranda documenting interviews by Internal Revenue Service ("IRS") agents with each of the affiants. The affiants largely maintained the accuracy of their affidavits to the IRS agents despite being warned of the penalties for lying.

The government opposed the motion and attached an affidavit executed by Bromfield. In the affidavit, Bromfield swore that he testified truthfully at Davis's trial, that he never made the statements imputed to him by the inmates, and that he was not recanting his trial testimony.

The district court denied the renewed motion for new trial without a hearing. The court discussed two reasons for denying the motion. First, the court found that the affidavits were not credible, noting that the three original affidavits appeared to have been prepared on the same date by Frank Amodeo, a "serial filer" with whom the court was familiar. The court found that the "circumstances indicate[d] a coordinated effort by those involved to manufacture a controversy." Second, the court found that, even if the affidavits were credible, they did not constitute newly discovered evidence. The court stated that Bromfield had effectively retracted any recantation attributed to him by the affiants, so a new trial was not warranted based

12

on *United States v. Santiago*, 837 F.2d 1545, 1550 (11th Cir. 1988) (no new trial required based on a witness's recantation that was later retracted).

More than two months after the denial of the renewed Rule 33(b) motion, Davis filed a *pro se* motion for "clarification" on the limitations of his ability to file *pro se*, which the court struck as an unauthorized *pro se* filing, and then a motion for recusal and for a *Faretta* hearing. In this filing, Davis indicated that he wished to bring "new claims," in addition to the old claims, in a second Rule 33(b) motion, though he did not identify what these new claims were. The court denied the motions, finding no basis for recusal and citing its prior denial of his first Rule 33(b) motion. Thereafter, Davis again sought "clarification," and he requested a hearing under *Faretta*. The court summarily rejected these requests.

Davis has appealed the judgment of conviction and sentence (No. 15-13997), the denial of his Rule 33(b) motion for new trial (No. 16-17781), and the denial of his motions relating to his request to file a second Rule 33(b) motion for new trial (No. 17-12057). These appeals have been consolidated. Davis is represented by counsel in the first two appeals; he proceeds *pro se* in the final one.

## III.

Davis first challenges the sufficiency of the evidence to support his fraud convictions.[4] We review *de novo* whether sufficient evidence supports a jury's

---

[4] Davis does not raise any independent issue with respect to his convictions for money

verdict in a criminal trial, "viewing the evidence in the light most favorable to the government, and drawing all reasonable factual inferences in favor of the jury's verdict." *United States v. Toll*, 804 F.3d 1344, 1354 (11th Cir. 2015) (quotation marks omitted). "The defendant must do more than put forth a reasonable hypothesis of innocence, because the issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt." *Id.* (quotation marks omitted).

A conviction for conspiracy to commit mail or wire fraud, in violation of 13 U.S.C. § 1349, requires proof that two or more persons agreed to commit mail or wire fraud and that the defendant knowingly and voluntarily joined the agreement. *United States v. Martin*, 803 F.3d 581, 588 (11th Cir. 2015). The elements of mail and wire fraud are (1) intentional participation in a "scheme to defraud", and (2) use of the mails or wires in furtherance of the scheme. *United States v. Ward*, 486 F.3d 1212, 1221–22 (11th Cir. 2007); *United States v. Hasson*, 333 F.3d 1264, 1270 (11th Cir. 2003); *see also* 18 U.S.C. §§ 1341, 1343.

A "scheme to defraud" is a scheme to deprive another of money or property through deceit, such as misrepresentations. *United States v. Bradley*, 644 F.3d 1213, 1238–39 (11th Cir. 2011). The misrepresentation must be "material"—having the

---

laundering. Rather, he maintains that, if his fraud convictions fall, so too should the money-laundering convictions. Because sufficient evidence supports the fraud convictions, we likewise affirm the money-laundering convictions.

natural tendency to influence, or be capable of influencing, the decision-maker to whom it is addressed—but the government need not show "the victim actually relies on the misrepresentation or omission." *Id.* at 1239; *see Neder v. United States*, 527 U.S. 1, 24–25 (1999) ("By prohibiting the 'scheme to defraud,' rather than the completed fraud, the elements of reliance and damage would clearly be inconsistent with the statutes Congress enacted."). Rather, "proof of intent to defraud is sufficient." *Bradley*, 644 F.3d at 1239.

In evaluating evidence of intent to defraud, "[w]e must determine whether the defendant attempted to obtain, by deceptive means, something to which he was not entitled." *Id.* The jury is permitted to infer an intent to defraud from the defendant's conduct. *Id.* And "[e]vidence that a defendant personally profited from a fraud may provide circumstantial evidence of an intent to participate in that fraud." *Id.* (quotation marks omitted).

Not all deception constitutes fraud, however. "[A] schemer who tricks someone to enter into a transaction has not 'schemed to defraud' so long as he does not intend to harm the person he intends to trick." *United States v. Takhalov*, 827 F.3d 1307, 1313 (11th Cir. 2016). That remains the case "even if the transaction would not have occurred but for the trick," because there is "no intent to harm." *Id.* Deception becomes fraud when it is used to obtain something to which the deceiver is not entitled. *Id.* at 1313–14.

15

Davis argues that the government failed to prove that the investors' losses were connected to the deception. He asserts that the government's evidence at best demonstrates that investors were misled about his wealth and lifestyle, and that the false rates of return reported to investors did not affect their investment decisions. He maintains that investors received what they bargained for, even if Capital Blu's deception caused them to enter into transactions they would otherwise have avoided.

The district court properly denied Davis's motions for judgment of acquittal. The evidence presented at trial demonstrated that Davis and his partners in Capital Blu perpetrated a scheme to lie to potential and current investors to get them to invest in or to stay invested in Capital Blu. The deception included falsely telling investors that Capital Blu had posted gains every month of its existence, providing investors with fraudulent monthly account statements showing that their investment had appreciated in value when the opposite was true, and falsely telling potential investors that only a small percentage of investor money was at risk to due a "stop loss" policy. In other words, investors were led to believe that they were making fairly low-risk investments with an established company that had never reported a loss. Then, after making an initial investment, investors were led to believe, again falsely, that their investments were consistently making money. But none of these things was true. These misrepresentations are material because they go to the heart of the riskiness of the investment, so they have the natural tendency to influence, or

16

be capable of influencing, reasonable people making decisions about where and how to invest their money. *See Bradley*, 644 F.3d at 1238–39.

Davis contends that the government failed to prove that the investors actually relied on any false representations about Capital Blu's performance or its risk policies. But the government did not need to. *See id.* at 1239 ("It is . . . unnecessary that the victim actually relies on the misrepresentation or omission; proof of intent to defraud is sufficient."). It is enough "that the scheme be reasonably calculated to deceive." *Id.* In any case, the testimony of the investors at trial, construed in the light most favorable to the government, showed that investors did, in fact, rely on Davis's representations about Capital Blu's safety and consistent gains, and not just on his apparent wealth and flashy lifestyle.

Further, a reasonable jury could rationally find the necessary intent to defraud—that is, that Davis "attempted to obtain, by deceptive means, something to which he was not entitled." *Id.* at 1240. At the same time Davis was soliciting investments in Capital Blu, using the material misrepresentations we have discussed above, he and his partners were improperly diverting investor funds for their own personal benefit. The evidence shows that Davis and his partners used more than $4 million in investor funds to enrich themselves in ways that were not authorized by the investor agreements. Based on this evidence, a reasonable jury could conclude that, through deception about Capital Blu's performance and risk, Davis and his

partners sought to obtain and retain funding that could be used to inure to their personal benefit and to continue the fraud. *See id.* at 1239 ("Evidence that a defendant personally profited from a fraud may provide circumstantial evidence of an intent to participate in that fraud.").

For these reasons, Davis's convictions are supported by sufficient evidence in the record. *See Toll*, 804 F.3d at 1354.

## IV.

Davis next raises several alleged trial errors. First, he argues that the government knowingly presented false, inaccurate, and unreliable testimony at trial. Second, he contends that the district court plainly erred by failing to exclude a coconspirator's plea agreement that referenced a polygraph examination. Third, he asserts that the court abused its discretion by limiting evidence of another coconspirator's prior fraudulent conduct. Finally, he challenges the court's jury instructions. We take each issue in turn.

## A.

Ordinarily, "[a]llegations of prosecutorial misconduct present mixed questions of law and fact that we review *de novo*." *United States v. Campa*, 529 F.3d 980, 992 (11th Cir. 2008). However, where a defendant does not raise a claim of prosecutorial misconduct at trial or otherwise call the issue to the attention of the

district court, we review for plain error only. *United States v. Horner*, 853 F.3d 1201, 1206 (11th Cir. 2017).

Where the government knowingly solicits or fails to correct false testimony, due process requires a new trial where "the false testimony could in any reasonable likelihood have affected the judgment of the jury." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (ellipsis and quotation marks omitted). "To prevail on a *Giglio* claim, a defendant must establish that (1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material, *i.e.*, that there is any reasonable likelihood that the false testimony could have affected the judgment." *United States v. Stein*, 846 F.3d 1135, 1147 (11th Cir. 2017) (alterations omitted). This "could-have" standard requires a new trial unless the false testimony was harmless beyond a reasonable doubt. *Id.*

Davis alleges four instances of false testimony at his trial. We review for plain error because Davis did not raise these precise complaints of *Giglio* error to the district court. In any event, Davis's claims fail even under *de novo* review.

First, Davis contends that the government failed to correct false testimony about the amount of investor money under Capital Blu management at the end of January 2008. As noted above, the government offered evidence that, after Capital Blu sustained trading losses on January 22, Capital Blu's accountant, Beth Courtney, produced a report showing that Capital Blu had around $9 million in its accounts.

19

That figure included $4 million in a purported Saxo Bank account, but other evidence offered by the government showed that this account did not exist.

The government did not mislead the jury as to the state of Capital Blu's finances in January 2008. There is no evidence that Courtney was aware that the account did not exist when she prepared the report, and the government offered evidence that the account had been fabricated by Blayne. The amount of money also was not material. Regardless of the amount of money under management, Davis and his coconspirators agreed to cover up the January 2008 loss and never reported an accurate performance figure to investors.

Second, Davis asserts that the government failed to correct false testimony by Courtney about the manner in which Capital Blue determined the value of the assets under management. Courtney testified that she did not believe that there were any contracts open at the end of January 2008. Davis suggests, however, that it was Capital Blu's practice, as well as industry practice, not to close out all trade contracts at the end of the month and to hold negative contracts open until they rebounded. He suggests that the monthly gains reported to investors were reasonable estimates in light of market volatility.

But even if Courtney was mistaken about whether any contracts were open at the end of January 2018, nothing indicates that she was providing anything but honest and truthful answers about her recollection of the report. Nor is there a

20

reasonable likelihood that this small point of evidence could have affected the judgment of the jury. *See Stein*, 846 F.3d at 1147. Even if there were open contracts, other evidence indicated there was an established method for putting a value on those contracts, and the monthly reported gains were not legitimate estimates.

Third, Davis contends that the government offered false testimony from Bromfield that he was aware of trading losses from January 2008 through August 2008, despite telling Davis in a recorded call that he did not know about the losses until late July. But contemporaneous emails offered by the government clearly establish that Bromfield, consistent with his trial testimony, knew of Capital Blu's heavy losses on January 22, 2008, as well as the ongoing "gap" in the months thereafter.

Finally, Davis maintains that the government used false testimony from Bromfield about Blayne's diversion of Capital Blu money to another entity, Nakano Capital. While the record indicates that Bromfield initially did not provide accurate information about the size and origin of the money diverted to Nakano, the government quickly corrected that error by attempting to rehabilitate Davis's answers on redirect examination and by entering a stipulation containing the correct information on this point of evidence.

Further, the government did not implicitly vouch for Bromfield's testimony during its redirect examination because its questioning was based on information

21

that was presented to the jury in a stipulation during trial. *See United States v. Epps*, 613 F.3d 1093, 1100 (11th Cir. 2010) (holding that the prosecutor's comments were not improper vouching because those statements were based on information presented to the jury). In any event, this evidence about Blayne's side-scam was not material because it was tangential to the evidence of Davis's guilt.

In sum, we reject Davis's claims of prosecutorial misconduct.

## B.

Davis challenges the admission of Bromfield's plea agreement, which included a provision in which Bromfield agreed to submit to polygraph examinations. He argues that this constituted improper witness bolstering.

When a defendant fails to object to an alleged evidentiary error at trial, we may review the issue for plain error only. *United States v. Turner*, 474 F.3d 1265, 1275 (11th Cir. 2007). To succeed on plain-error review, the defendant must show that a clear or obvious error affected his substantial rights. *Id.* at 1276. "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for [the error], the outcome of the trial would be different." *United States v. McQueen*, 727 F.3d 1144, 1155 (11th Cir. 2013).

Evidence of a witness's willingness to submit to a polygraph examination is inadmissible in a criminal case. *United States v. Hilton*, 772 F.2d 783, 785 (11th Cir. 1985). In particular, courts should not admit "[e]vidence of plea agreements

22

containing provisions that the government's witnesses have agreed to take polygraph tests to verify trial testimony" because such evidence "constitutes improper bolstering of the witnesses' credibility." *Id.* at 786. In *Hilton*, we reversed a conviction where the district court, after admitting witnesses' plea agreements containing polygraph provisions, permitted the prosecutor in closing argument to contend that the witnesses "were credible because they agreed to take polygraph examinations." *Id.*

Here, Davis did not object to the admission of Bromfield's unredacted plea agreement during trial, so we review for plain error only. We assume without deciding that the district court committed an error that was plain by admitting the plea agreement without redacting the reference to Bromfield's willingness to submit to polygraph examinations.[5]

But even if we assume there was error, that error would warrant a reversal only if Davis could show that it affected his substantial rights. *See Turner*, 474 F.3d

---

[5] *Hilton* outlines a "suggested procedure" for handling the admission of plea agreements with truth-telling provisions, providing that, if a witness's credibility has not been attacked, "the clauses of the plea agreement in which the witness promised to testify truthfully should be redacted before the document is admitted in evidence unless the admission of the plea agreement is not questioned." 772 F.2d at 787. The government believes that polygraph provisions are covered by this same procedure, but we are doubtful. While *Hilton* suggests that a witness's promise in a plea agreement to testify truthfully may be admissible, depending on context, *see id.*, it does not outline any permissible purpose for a promise to submit to polygraph examinations. To the contrary, it squarely states that "evidence of a witness' willingness to submit to a polygraph examination is . . . inadmissible" and "constitutes improper bolstering of the witnesses' credibility," *id.* at 785–86. The polygraph provision should have been redacted.

23

at 1276. That means showing a reasonable probability of a different trial result. *See McQueen*, 727 F.3d at 1155. Davis has not met this burden.

The error of admitting the plea agreement's reference to a polygraph examination was harmless. Unlike the prosecutor in *Hilton*, the prosecutor here did not highlight the polygraph provision for the jury or argue that Bromfield was credible because he had agreed to take a polygraph examination. *See* 772 F.2d at 786; *cf. United States v. Lewis*, 110 F.3d 417, 421 n.2 (7th Cir. 1997) (error in admitting a reference to a polygraph was harmless where "the government did not attempt to link the witnesses' credibility to the polygraph provisions of the plea agreement"). Nor did the prosecutor otherwise improperly vouch for Bromfield's credibility "by making explicit personal assurances of [his] veracity." *See Epps*, 613 F.3d at 1100 (quotation marks omitted). Just the opposite. The prosecutor elicited on direct examination that Bromfield had perjured himself multiple times during the investigation of this case. And in its closing argument, the government explicitly said that it did not "vouch" for Bromfield's testimony and that the jury should weigh that testimony with the other corroborating evidence.

For these reasons, there is no indication that the jury was misled as to Bromfield's credibility, nor is there a reasonable probability that, but for the admission of Bromfield's plea agreement, the outcome of Davis's trial would have been different. *See McQueen*, 727 F.3d at 1155.

## C.

One of the pillars of Davis's defense in this case was that he was duped by the inveterate fraudsters Bromfield and Blayne. To this end, Davis sought to admit evidence of Blayne's "earlier Ponzi scheme," which, in Davis's view, "mirrored the Capital Blu fraud."

Before starting Capital Blu, Blayne participated in a Ponzi scheme in which he offered investment opportunities in the forex market at a guaranteed rate of return. *United States v. Blayne Davis*, 491 F. App'x 48, 50 (11th Cir. 2012). After the scheme collapsed, Blayne went to work for Capital Blu, and he used Capital Blu money to settle claims against him arising from the prior scheme. *United States v. Blayne Davis*, 721 F. App'x 856, 857 (11th Cir. 2018). According to Davis, the district court in this case deprived him of a material defense by "impos[ing] a strict prohibition" on this evidence.

We ordinarily review a district court's evidentiary rulings for abuse of discretion. *United States v. Merrill*, 513 F.3d 1293, 1301 (11th Cir. 2008). During this review, we bear in mind that "[t]he district court has broad discretion to determine the relevance and admissibility of any given piece of evidence." *Id.* Evidentiary errors are subject to review for harmlessness. *United States v. House*, 684 F.3d 1173, 1197 (11th Cir. 2012). A non-constitutional evidentiary error does

not warrant reversal unless there is a reasonable likelihood that the error affected the defendant's substantial rights. *Id.*

Here, the district court did not abuse its discretion in preventing Davis from offering a more fulsome picture of Blayne's prior fraudulent conduct.[6] Even if the court considered this evidence to be relevant, it could properly exclude it if it believed that its probative value was substantially outweighed by the danger of unfair prejudice or confusion of the issues or because it was improper character evidence. *See* Fed. R. Evid. 403, 404. Indeed, the record indicates that the court harbored concerns about the possibility of the defense introducing improper propensity evidence as to Blayne. And there was a potential for evidence of prior fraudulent conduct in which Davis was not involved to confuse the issues before the jury. We see no abuse of the district court's broad discretion in choosing to limit the evidence of Blayne's prior fraudulent activities. *See Merrill*, 513 F.3d at 1301.

In any case, even if error occurred, any error was harmless. Davis was not impeded from presenting his "material defense" that he had been duped by Blayne and Bromfield, who perpetrated the fraud without his knowledge. His attorneys were able to adequately convey this in their opening and closing statements and during cross-examination. Even if the defense had been able to present evidence

---

[6] The government questions whether there is any evidentiary ruling to review. But even assuming that the court issued a ruling in the way Davis contends, we see no reversible error.

26

that Blayne used Capital Blu investor funds to pay off investors from a prior, similar Ponzi scheme, that would not taint or undermine the evidence presented in this trial that Davis knew of the large losses sustained by Capital Blu, agreed to hide these losses from investors, continued to make misrepresentations to solicit more investors, and diverted investor funds to enrich himself. Thus, there is no reasonable likelihood that the error affected Davis's substantial rights. *See House*, 684 F.3d at 1197 ("[W]e will not reverse a defendant's conviction on the basis of an evidentiary error that does not implicate his constitutional rights if the error had no substantial influence, and enough evidence supports the result apart from the phase affected by error." (quotation marks omitted)).

## D.

Davis raises three challenges to the district court's jury instructions. First, he contends that the court erroneously instructed the jury that it could consider oral statements made in connection with the written investor agreements. According to Davis, this instruction eviscerated his primary theory of defense, which was that the written contracts "controlled the investor's decisions." Second, Davis argues that the court erred by refusing to give his requested instruction that puffery or sales talk cannot form the basis for a fraud charge. Third, Davis argues that the district court erred in refusing to give his theory-of-defense instruction containing his theory that he was the victim of a fraud perpetrated by his partners.

27

We review the "legal correctness" of jury instructions *de novo* but review the "phrasing of the instructions for abuse of discretion." *United States v. Focia*, 869 F.3d 1269, 1280 (11th Cir. 2017), *cert. denied*, (U.S. Jan. 7, 2019) (No. 18-6817). The refusal to give a requested jury instruction is also reviewed for an abuse of discretion. *United States v. Votrobek*, 847 F.3d 1335, 1344 (11th Cir. 2017). The refusal to give a requested instruction is reversible error only if the "instruction (1) was a correct statement of the law; (2) was not adequately covered in the instructions given to the jury; (3) concerned an issue so substantive that its omission impaired the accused's ability to present a defense; and (4) dealt with an issue properly before the jury." *Id.* (quotation marks omitted).

Davis has not shown reversible error. First, the district court properly instructed the jury that, when weighing the evidence, it "may consider both oral statements made in connection with the agreements and the written agreements themselves." That instruction is consistent with established case law, which does not require proof that the victim "actually relie[d] on the misrepresentation or omission; proof of intent to defraud is sufficient." *Bradley*, 644 F.3d at 1239 (citation and quotation marks omitted). The oral statements here are probative of Davis's intent to defraud.

Davis offers no legal support for his argument that, in a criminal prosecution for mail fraud and wire fraud, a written contract will override material oral

misrepresentations made to victims. *Cf. United States v. Kreimer*, 609 F.2d 126, 132–33 (5th Cir. 1980) ("The parole evidence rule that, in contract cases, prevents the parties to a written contract from offering evidence that the contract was something different does not apply in criminal cases."). Accordingly, the instruction was not erroneous.

Second, the district court did not abuse its discretion by refusing to give Davis's proposed "puffery" instruction. "Puffing" or "sellers talk" is not a crime under the federal fraud statutes. *United States v. Martinelli*, 454 F.3d 1300, 1317 (11th Cir. 2006). But a trial court judge may properly refuse to issue an instruction on a puffery defense where the misrepresentations at issue "were not exaggerated opinions or hyped-up sales pitches," but were, rather, "factual statements that were verifiably refutable." *Id.* Here, the statements that Davis made to investors, as contained in the trial testimony, fell into the latter camp, not the former one.

Multiple investors testified that, in deciding to invest with Capital Blu, they relied on Davis's statements that Capital Blu never posted a loss, his provision of marketing materials showing its tremendous and never-ending gains, his assurances that there was a "stopgap" in place to protect most of their money, and, once they invested, his later assurances that Capital Blu was doing well and that their investments were profitable. The trial evidence also demonstrated that, after January 2008, Davis knew all of this to be untrue. These misrepresentations, like the ones in

*Martinelli*, "cannot in any stretch be characterized as mere puffery or just a sales pitch," and the district court accordingly did not abuse its discretion in refusing to give this instruction. *See* 454 F.3d at 1317.

Finally, the district court did not abuse its discretion in refusing to give Davis's proposed theory-of-defense instruction. Such a refusal is reversible error only when the requested instruction concerns an issue so substantive that its omission impaired the defendant's ability to present a defense. *See Votrobek*, 847 F.3d at 1344. Here, through defense counsel's opening and closing statements, cross-examination of the government's witnesses, and presentation of the defense witnesses, Davis was able to present his theory that he was the victim of a scheme perpetrated by Blayne and Bromfield. The jury did not accept this theory. Accordingly, Davis has not shown that the district court's handling of jury instructions warrants reversal.

## V.

Davis next challenges the district court's loss calculation at sentencing. We review a district court's amount-of-loss determination for clear error. *United States v. Machado,* 333 F.3d 1225, 1227 (11th Cir. 2003). Under this standard, we will not reverse unless we are left with a definite and firm conviction that a mistake has been committed. *United States v. White*, 335 F.3d 1314, 1319 (11th Cir. 2003). "The district court's factual findings for purposes of sentencing may be based on, among

30

other things, evidence heard during trial, undisputed statements in the [PSR], or evidence presented during the sentencing hearing." *United States v. Hamaker,* 455 F.3d 1316, 1338 (11th Cir. 2006) (quotation marks omitted).

Section 2B1.1 of the 2013 guidelines manual—the version applied at Davis's sentencing—provides for a 20-level enhancement if the loss is between $7 million and $20 million. U.S.S.G. § 2B1.1(b)(1)(K). "Loss" under the guidelines is the greater of actual or intended loss. *Id.* § 2B1.1, cmt. n.3(A). The court here relied on actual loss, which means the "reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* Loss is based on a defendant's "relevant conduct," which includes "all acts and omissions omitted, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" in relation to commission of the offense. U.S.S.G. § 1B1.3(a)(1)(A).

The district court need only make a "reasonable estimate" of the loss; absolute precision is not required. *United States v. Campbell*, 765 F.3d 1291, 1301 (11th Cir. 2014); U.S.S.G. § 2B1.1, cmt. n.3(C). The loss amount should be based on "available information," such as the fair market value of the property taken or destroyed. U.S.S.G. § 2B1.1, cmt. n.3(C). And it must be reduced by any sums returned to victims before the offense was detected. *Id.* § 2B1.1, cmt. n.3(E)(i). "[B]ecause the district court is in a unique position to assess the evidence, its loss

determination is entitled to appropriate deference." *Bradley*, 644 F.3d at 1290 (quotation marks omitted).

Here, the district court did not clearly err in calculating the amount of loss attributable to Davis under § 2B1.1.  Initially, the court did not err procedurally in calculating loss.  While the court did not make specific findings, the "failure to make specific findings does not preclude appellate review where the court's decisions are based on clearly identifiable evidence." *Bradley*, 644 F.3d at 1293.  Here, by adopting the PSR's guideline calculations, which the government supported at sentencing with a summary exhibit based on trial evidence, the court made clear the evidence on which it relied and its reasons for doing so. *See id.* ("In adopting the [PSR], the court made it clear that it was resolving all questions of fact in favor of the Government. From this, we can easily determine on which evidence the court relied, and we require nothing more.").

The calculated loss of $10,520,005 was a "reasonable estimate" of the loss based on available information. *See Campbell*, 765 F.3d at 1301.  The court relied on the PSR and on the government's exhibit documenting the losses suffered by investors during the period of the conspiracy and as a result of Davis's own pre-conspiracy false representations. *See* U.S.S.G. § 2B1.1, cmt. n.3(C); *Id.* § 1B1.3(a)(1)(A).  Further, the PSR and the exhibit excluded from the loss

calculations funds returned to investors and funds stolen by the receiver after the conspiracy ended. *See id.* § 2B1.1, cmt. n.3(E)(i).

Davis's allegations of what amounts should not be included are vague and are not supported by record citations. He claims he should not be responsible for any investments made before January 2008, but those investors were still misled as to the state of their investments during the conspiracy and then suffered extensive losses. And the conspiracy's false statements allowed Capital Blu to continue to hold and use those investors' funds.

Davis also states that the loss amount included money he himself invested, but the record supports a finding that this money was his family's, not his own. He contends that his other partners' personal use of investor money was not reasonably foreseeable or jointly undertaken, but the record belies this claim.[7]

Finally, although Davis argues for the first time on appeal that the total amount includes $4 million in losses from market volatility, which he says were not reasonably foreseeable, he has not established plain error. Davis relies on our decision in *Stein* for this argument, but *Stein* did not hold that losses due to market volatility must always be excluded when calculating investment-fraud losses.

---

[7] While Blayne's diversion of Capital Blu funds to Nakano Capital was not within the scope of the jointly undertaken activity, Davis cites no record support for his claim that the amount Blayne stole was $3 million. The evidence at trial indicated that the amount stolen was less than $1 million. Excluding these stolen funds from the loss amount—to the extent they were included in the first place—would not affect the guideline range because the total loss amount would remain above $7 million. *See* U.S.S.G. § 2B1.1(b)(1)(K) (2013). So any error was harmless.

Rather, we said that once a defendant "point[s] to intervening events that may have affected" the eventual losses, the court must "make findings regarding the effects of these intervening events, if any, and whether these events were reasonably foreseeable to [the defendant]." *Stein*, 846 F.3d at 1156. So we remanded for the court to make a factual finding of reasonable foreseeability based on the specific facts before it. *Id.*

Here, however, Davis did not identify any intervening events at sentencing that the court was required to make findings about, and we cannot say that it is "plain" that the extensive losses suffered by Capital Blu in August 2008 were not reasonably foreseeable. *See United States v. Allmendinger*, 706 F.3d 330, 342–43 (4th Cir. 2013) (concluding that investor losses were reasonably foreseeable, despite other potential causes, where "people were deceived into entrusting their money to A & O on the false pretense that the company had an incredible record of protecting its investors' principal while earning hundreds of millions of dollars in double-digit returns").

Giving appropriate deference to the district court's loss findings, we cannot say that the court clearly erred in determining that Davis was responsible for investor losses of more than $7 million but less than $20 million. We affirm his sentence.[8]

---

[8] Davis also argues that he was "effectively without counsel" because his lawyer at sentencing had a conflict of interest and his counsel failed to properly prepare for the sentencing hearing. This purported ineffective-assistance-of-counsel claim is more properly brought in a

## VI.

Davis argues that the district court abused its discretion by failing to hold an evidentiary hearing on his first motion for a new trial based on newly discovered evidence under Rule 33(b).  He also contends, *pro se*, that the court erred in several ways in handling his request to file a second such motion.

## A.

We review a district court's denial of a motion for new trial for an abuse of discretion.  *United States v. Grzybowicz*, 747 F.3d 1296, 1304 (11th Cir. 2014). Under the abuse-of-discretion standard, we must affirm unless we find that the district court "made a clear error of judgment, or has applied the wrong legal standard." *Id.* at 1305.  We likewise review for abuse of discretion a decision to deny such a motion without holding an evidentiary hearing.  *United States v. Schlei*, 122 F.3d 944, 990 (11th Cir. 1997).  An evidentiary hearing on a Rule 33 motion is not required where the record contains all of the evidence needed to rule on that motion. *See United States v. Scrushy*, 721 F.3d 1288, 1305 n.30 (11th Cir. 2013).

While "[n]ewly discovered evidence need not relate directly to the issue of guilt or innocence to justify a new trial, but may be probative of another issue of

collateral motion under 28 U.S.C. § 2255.  *See Massaro v. United States*, 538 U.S. 500, 504-05 (2003) ("[I]n most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance."); *United States v. Patterson*, 595 F.3d 1324, 1328 (11th Cir. 2010) (noting that this Court does not generally consider claims of ineffective assistance of counsel on direct appeal that were not raised in the district court unless a factual record for such a claim was sufficiently developed).

law," the new evidence still must be such that it "would afford reasonable grounds to question . . . the integrity of the verdict." *Id.* (quotation marks omitted). To succeed under Rule 33 based on newly discovered evidence, the defendant must establish that (1) the evidence was discovered after trial; (2) the failure to discover the evidence was not due to a lack of due diligence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) a new trial would probably produce a different result. *Id.*; *United States v. Jernigan*, 341 F.3d 1273, 1287 (11th Cir. 2003).

Here, the district court applied the correct standard and did not abuse its broad discretion in denying Davis's amended Rule 33 motion for new trial based on the purported newly discovered evidence offered by the four jailhouse affiants. Davis almost exclusively challenges the court's determination that the affidavits were not credible, ignoring the court's alternative finding that a new trial was not warranted even if the inmates' affidavits were credible. We affirm the district court based on the latter determination.

Bromfield's trial testimony was supported by extensive contemporaneous documentation and testimony from Capital Blu's accountant, Beth Courtney, and his vague post-trial claims to other prisoners, which he later retracted, lacked any specificity as to what he was supposedly lying about. In these circumstances, the court did not abuse its discretion in denying the motion for new trial. As the court

36

explained, "recantations are viewed with extreme suspicion by the courts." *Santiago*, 837 F.2d at 1550. And when a witness retracts a recantation, the witness's "version of events remains exactly as it was at trial." *Id.* Because Bromfield effectively retracted any recantation he had made to other prisoners, averring that his trial testimony was truthful, the district court's ruling was not "so clearly erroneous as to constitute an abuse of discretion." *Santiago*, 837 F.2d at 1550; *see United States v. Puentes*, 50 F.3d 1567, 1578 (11th Cir. 1995) (no abuse of discretion in denying new trial based on evidence that a government witness informed a journalist that he would recant his testimony, where the witness later retracted the recantation).

Nor did the district court abuse its discretion in denying the motion without an evidentiary hearing. No evidentiary hearing was necessary to determine the affiants' credibility because, as we have explained, a new trial was not warranted even assuming they were credible. The record otherwise contained all the evidence necessary to rule on the motion. *See Scrush*y, 721 F.3d at 1305 n.30.

## B.

Finally, Davis, *pro se*, argues issues related to his request to file a second Rule 33(b) motion. As noted above, more than two months after the denial of the counseled Rule 33(b) motion, Davis submitted several *pro se* filings broadly indicating that he wanted to file a second Rule 33(b) motion *pro se*. The court first

struck Davis's motion for "clarification" on the limitations of his ability to file *pro se*, noting that he was represented by counsel; it then denied his motions for recusal and for permission to file a second Rule 33(b) motion, finding no basis for recusal and citing its order denying the counseled Rule 33(b) motion; and finally, it summarily denied his request for clarification and a hearing under *Faretta*.

Davis argues that he cannot afford new counsel and the district court's refusal to let him proceed *pro se* violates due process. Alternatively, he maintains that, if the court was right to require that the motion be filed by counsel, then the court also needed to appoint counsel for what was, in Davis's view, a critical stage of the proceedings. Finally, he contends that the court should have recused.

We see no basis to reverse the district court's actions. At the time Davis indicated that he wished to file a second Rule 33(b) motion *pro se*, Davis was represented by counsel on appeal of the judgment and of the denial of his counseled Rule 33(b) motion. These appeals implicated the same grounds on which Davis apparently sought to file a second Rule 33(b) motion—the jailhouse affidavits and other issues relating to the government's knowledge of Bromfield's credibility. While Davis broadly referenced "new claims" he sought to raise in a second Rule 33(b) motion, his filings offered little else to suggest that he would be relying on claims or evidence that had not been addressed at some point in the proceedings. Because Davis appeared to be attempting to rehash issues *pro se* that the district

38

court had previously resolved and that were then pending on appeal, the court did not abuse its discretion or otherwise err by denying his various filings relating to a second Rule 33(b) motion.  We have considered Davis's other arguments regarding *Faretta* and his right to counsel and find them to be without merit.

Nor did the district court abuse its discretion by denying Davis's recusal motion.  *See Scrushy*, 721 F.3d at 1303.  A district court judge must disqualify himself "in any proceeding in which his impartiality might reasonably be questioned," 28 U.S.C. § 455(a), or where "he has a personal bias or prejudice concerning a party," 28 U.S.C. § 455(b)(1).  The standard of review on a motion for recusal based on the appearance of impropriety "is whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality."  *United States v. Patti*, 337 F.3d 1317, 1321 (11th Cir. 2003).

Here, Davis has not identified any source of extrajudicial bias or shown that there was pervasive bias that prejudiced him.  *See United States v. Bailey*, 175 F.3d 966, 968 (11th Cir. 1999).  While the district court's December 21, 2016, denial of his amended Rule 33 motion indicated a distaste for the filings of Amodeo, the prisoner who prepared the motion, that's not enough for an objective, disinterested lay observer to entertain a significant doubt about the judge's impartiality.  *See Patti*, 337 F.3d at 1321.  As explained above, there were good alternative reasons for the

39

court to deny the motion, and adverse rulings "alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States*, 510 U.S. 540, 555 (1994).

## VII.

Having considered the record and the briefs submitted by the parties, we hereby affirm Davis's convictions and sentences. We affirm the district court's denial of Davis's amended Rule 33 motion for new trial. And we affirm the district court's denial of Davis's motions for permission to file a second Rule 33 motion, for the district court judge's recusal, and for a *Faretta* hearing.

**AFFIRMED.**